# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| OJ COMMERCE LLC; and<br>NAOMI HOME, INC.,<br><br>        *Plaintiffs*<br><br>against<br><br><br>KIDKRAFT, LP; and<br>MID-OCEAN PARTNERS, LP<br><br>        *Defendants.* | Case #: 0:19-cv-60341<br><br><br>**COMPLAINT** |

Plaintiffs, OJ Commerce, LLC ("OJC") and Naomi Home, Inc. ("NH") hereby bring this action for damages and other relief against Defendants KIDKRAFT, LP ("KidKraft") and MID-OCEAN PARTNERS, LP ("MidOcean"), collectively ("Defendants"), for violations of § 1 and 2 of the Sherman Antitrust Act.

## PARTIES

1.      Plaintiff OJC is a Delaware limited liability company with its principal place of business in Broward County, Florida. Plaintiff's single member resides in Florida. OJC is an online retailer engaged in interstate commerce within the continental United States. OJC resells, *inter alia*, wooden play kitchens.

2.      Plaintiff NH is a Delaware corporation, with its principal place of business in Broward County, Florida. NH is a manufacturer of consumer products. NH manufactures, *inter alia*, wooden play kitchens.

3.      While distinct corporate entities, NH and OJC share a common owner.

4.      Defendant KidKraft is a Texas corporation with its principal place of business in Dallas, Texas. KidKraft manufactures toys that it sells both wholesale and for retail. One of its

most popular line of products are wooden play kitchens. KidKraft is engaged in interstate commerce within the continental United States including this District.

5. Defendant MidOcean Partners is a Delaware corporation with its principal place of business in New York City, New York. MidOcean is a private equity firm, and has a significant interest in retail products within the play furniture category, such as wooden play kitchens sold within the continental United States.

## JURISDICTION AND VENUE

6. Plaintiffs' action arises under §1 and 2 of the Sherman Antitrust Act, which is codified at 15 U.S.C. §1 and 2. Plaintiffs seek damages under §4 of the Clayton Act, which is codified at 15 U.S.C. §15.

7. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 15; § 28 U.S.C. § 1331, and 28 U.S.C. 1337(a). This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

8. This Court has personal jurisdiction over Defendant Kidkraft because, *inter alia*, it (a) transacted business within the United States, including this District, (b) sold products including wooden play kitchens throughout the United States, including this District (c) had substantial contacts with the United States, including in this District, and (d) was engaged in an unlawful restraint of trade that injured persons residing in, located in, or doing business throughout the United States, including this District. This Court also has personal jurisdiction over Defendant MidOcean because it satisfies (a), (c), and (d) above.

9. Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate

commerce within the United States. The activities of Defendants were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

10. This Court has also personal jurisdiction over Defendants pursuant to Fla. Stat. § 48.193, as each operated, conducted, engaged in, and carried on a business venture in this state; committed a tortious act within this state; and is engaged in substantial and not isolated activity within this state.

11. Venue is proper in this District pursuant to §12 of the Clayton Act (15 U.S.C. §22) and 28 U.S.C. §1391(b)-(d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District, and one or more of the Defendants resides in, is licensed to do business in, is doing business in, had agents in, or is found or transacts business in, this District.

## INTRODUCTION

12. Everyone knows that children enjoy playing pretend. To that end, toy stores sell little mini toy kitchens, or "play kitchens" that are kept in the bedroom or playroom and that enable children to pretend to cook and play house. Generally, these play kitchens are either made of wood or plastic. As detailed below, the market for wooden kitchens and plastic kitchens are distinct.

13. Defendant KidKraft controls over 70% of the wooden play kitchen market in the continental United States and that it has maintained that monopoly power illegally by leveraging it to exclude competition.

## FACTS COMMON TO ALL COUNTS

14. KidKraft manufacturers, wholesales, and retails, *inter alia*, wooden play kitchens.

KidKraft sells its products to online retailers like Amazon.com, and to brick and mortar stores like Costco, Walmart and Target. As detailed below KidKraft holds a dominant market position in the wooden play kitchen market within the Continental United States.

15. NH also manufacturers, *inter alia*, wooden play kitchens. It is KidKraft's direct competitor in the wholesale space.

16. OJC is an online retailer that sells, *inter alia*, wooden play kitchens. OJC competes in the online arena by providing aggressive discounts to consumers. As detailed below, OJC used to carry KidKraft and NH wooden play kitchens for sale.

*The relevant product market is the wholesale markets for wooden play kitchens*

17. The market for wooden play kitchens is unique and separate from the market for plastic play kitchens because they (1) are manufactured in different types of production facilities, (2) have different types of customers, (3) do not compete with each other, and (4) are priced differently.

18. For example, consumers prefer, and pay a higher price for, wooden models because (1) they have a more upscale appearance which is more appealing within a residential home; (2) the wooden models look and feel more like an authentic mini-kitchen which children like; (3) the wooden kitchens are more environmentally friendly; (4) wooden play kitchens are "some assembly required" products unlike most plastic versions; and (5) some parents believe them to be safer than plastic models that may contain toxic chemicals.

19. For these reasons and others, wooden play kitchen consumers would not buy plastic models and plastic models are not a substitute for wooden models. Said differently, it would be profitable for KidKraft to implement a small but significant, nontransitory increase in its prices of 5% or more, as consumers (and therefore retailers) would not find substitutes, but pay more for

the wooden models.

20.     In fact, consumers and retailers already pay a higher price for wooden models as they are generally significantly more expensive than plastic models.

21.     KidKraft is the largest manufacturer and wholesaler of wooden play kitchens sold within the continental United States (the "Market").

*The relevant geographic market is the continental United States*

22.     The Market for wholesale sales of wooden play kitchens is a national one, because the relationship between the product value, bulk, weight and consumer demand enables distribution on a nationwide basis. This is because the cost of shipping (whether for wholesale to retailers or for retail to consumers) is relatively stable within the continental United States. Consequently, manufacturer wholesalers sell on a nationwide basis as these kitchens are either sold to national brick and mortar retail chains like Costco, Walmart and Target, or sold to online retailers who sell to customers through online marketplaces like Amazon.com, Ebay.com, or Walmart.com.

23.     KidKraft's wooden play kitchens make up more than 70% of the wooden play kitchen market in the continental United States.

*The relationship between KidKraft and OJC*

24.     On or about September 2011, KidKraft and OJC entered into an agreement whereby OJC would sell Kidkraft's products online through various marketplaces.

25.     Year after year, this profitable relationship continued to grow in size and profitability until KidKraft unlawfully terminated it in 2016 for anti-competitive reasons.

*KidKraft and MidOcean's Anti-Competitive Conduct*

26.     After profitably selling KidKraft's wooden play kitchens for many years, OJC's

owner decided to direct another one of his subsidiaries, NH, to compete with KidKraft by manufacturing its own wooden play kitchens. In the middle of 2013, NH began manufacturing its own line of wooden play kitchens priced below KidKraft's.

27.     In November 2013, OJC began selling these wooden NH kitchens (the "Naomi Home Kitchen") in addition to continuing to sell KidKraft's wooden kitchens.

28.     In mid-2015, KidKraft employee Matan Wolfson called OJC's CEO Jacob Weiss to say that OJC must stop competing with KidKraft by selling the Naomi Home Kitchen or face termination of its relationship with KidKraft.

29.     OJC and NH are held by a common owner. Thus, both companies were aware of this threat. Despite KidKraft's monopoly power, OJC and NH did not immediately and completely bow to KidKraft's ultimatum because they were trying to break into the wooden play kitchen market and hoped that if they stayed small enough, KidKraft would ignore them. Nevertheless, NH did take a number of actions in response to KidKraft's threat. First, it scaled back production of current NH wooden play kitchen models so as not to compete too heavily with KidKraft. Second, it stopped trying to design and produce additional models so that KidKraft would not become concerned that NH was competing across many different models. Third, NH did not approach any other retailers to sell its kitchens as (i) it knew such attempts would be futile due to KidKraft's threats (no retailer would risk terminating their relationship with KidKraft), and (ii) NH believed that KidKraft would not feel threatened if NH stayed away from KidKraft's largest customer base, *i.e.*, retailers.

30.     These actions worked for some time and KidKraft appeared not to take action against OJC based on its carrying of NH products. But the respite was short lived.

31.     In the beginning of November 2016, a board meeting took place between KidKraft

6

and MidOcean at KidKraft's headquarters in Texas ("Meeting").

32. At the Meeting, Defendants discussed how OJC, a KidKraft retailer, was selling a competing wooden play kitchen manufactured by Naomi Home. Defendants then entered into an agreement to refuse to deal with OJC unless it ceased selling NH's competing products.

33. Immediately after the Meeting, on November 23, 2016, KidKraft employee Mr. Daniel Barr ("Mr. Barr") emailed OJC's CEO stating that "*In a board meeting recently the topic of the Naomi Kids Brand came up and this is something I would like to talk with you about along with the decline in sales over the previous 2 years.*" See Ex. A.

34. Mr. Barr called that same day and explained that MidOcean and KidKraft were concerned about the competition from Naomi Home. Mr. Barr informed OJC that they needed to discontinue selling the entire Naomi Home line, and that if they did not, KidKraft would refuse to deal with OJC in any way.

35. Plaintiff OJC did not cease selling the Naomi Home Kitchen as it was trying to break farther into the wooden play kitchen market and hoped that KidKraft would continue to let them "fly under the radar."

36. But on November 25, 2016, KidKraft fulfilled the threat. Without warning, KidKraft terminated its prior profitable business relationship with OJC, and ceased to process, ship, and fulfill any of OJC's customer orders (the "Termination").

37. After the Termination, NH was no longer under pressure to avoid selling its wooden play kitchens to retailers besides OJC. Nevertheless, it was unable to do so because retailers feared that if they carried NH's kitchens, KidKraft would refuse to deal with them too.

38. For example, after the Termination, Costco declined NH's offer to sell it wooden play kitchens at a very competitive price, expressly stating it could not jeopardize its relationship

with KidKraft by carrying NH's competing products.

39. KidKraft took these anti-competitive actions in order to stifle competition.

40. Plaintiffs have hired the undersigned firms to represent them in this action and have thereby obligated themselves to pay a reasonable fee to these firms.

## COUNT I – MONOPOLIZATION
### (OJC & NH Against KidKraft)

41. Plaintiffs repeats and reallege paragraphs 1 through 40, as it fully set forth herein.

42. This action arises out of 15 U.S.C. § 15 that provides a civil remedy by a party that was injured due to a violation of 15 U.S.C. § 2.

43. Defendant KidKraft controls more than 70% of the Market, *i.e.,* it has monopoly power.

44. KidKraft's monopoly power allows it to raise prices and exclude competition within the relevant Market.

45. Kidkraft voluntarily engaged with OJC in prior dealings for several years whereby OJC sold Kidkraft wooden play kitchens. These prior dealings were economically beneficial and profitable to KidKraft.

46. On or about November 25, 2016, Kidkraft unilaterally terminated its profitable prior course of dealing with OJC. KidKraft would not even sell to OJC at the price it charged any other retailer, but completely cut OJC off.

47. KidKraft's termination of its relationship with OJC had no legitimate business justification or procompetitive benefit. Instead, KidKraft undertook these anti-competitive and predatory actions to willfully maintain its monopoly power over the relevant Market by forgoing short-term profits to achieve an anticompetitive end of preventing NH from competing with it.

48. Specifically, KidKraft's intent was to use its greater than 70% market share to

maintain its monopoly on the Market. Its refusal to deal was designed solely to gain greater market share, drive up prices, and eliminate price competition.

49.     KidKraft's termination of its relationship with OJC was also intended to harm NH, by preventing it from selling its competing wooden play kitchens to any of KidKraft's retailers, and thereby freeze NH out of the Market.

50.     KidKraft's actions have actually harmed competition and consumers, by decreasing output of competitive wooden kitchens, restricting consumer choice of wooden play kitchens, decreasing avenues for distribution, and artificially inflating the price consumers pay for wooden play kitchens.

51.     As a result of KidKraft's abusive actions, Plaintiffs suffered economic damages, including compensatory and consequential damages.

WHEREFORE, Plaintiffs seek monetary damages, treble damages, reasonable attorney's fees, court costs, interest, and any other relief this Court deems proper.

### COUNT II - ATTEMPTED MONOPOLIZATION

52.     Plaintiffs repeats and reallege paragraphs 1 through 40 as it fully set forth herein.

53.     This action arises out of 15 U.S.C. § 15 that provides a civil remedy by a party that was injured due to a violation of 15 U.S.C. § 2.

54.     In the event it is found that KidKraft's position within the relevant Market does not amount to a monopoly power, Plaintiffs plead in the alternative for attempted monopolization.

55.     Kidkraft possess sufficient market share and power within the wooden play kitchen market within the continental United States that the actions described herein have a dangerous probability of achieving monopoly power, thereby enabling it to raise prices and exclude competition within the relevant Market.

56.     Kidkraft voluntarily engaged with OJC in prior dealings for several years whereby OJC sold Kidkraft manufactured wooden play kitchens. These prior dealings were economically beneficial and profitable to KidKraft.

57.     On or about November 25, 2016, Kidkraft unilaterally terminated its profitable prior course of dealing with OJC. KidKaft would not even sell to OJC at the price it charged any other retailer, but completely cut OJC off.

58.     KidKraft's termination of its relationship with OJC had no legitimate business justification or procompetitive benefit. Instead, KidKraft undertook these anti-competitive and predatory actions to acquire monopoly power over the relevant Market by forgoing short-term profits to achieve an anticompetitive end.

59.     Specifically, KidKraft's intent was to use its greater than 70% market share to monopolize the Market. Its refusal to deal was designed solely to gain greater market share, drive up prices, and eliminate price competition.

60.     KidKraft's termination of its relationship with OJC was also intended to harm NH by preventing it from selling its competing wooden play kitchens to any of KidKraft's retailers, and thereby freeze NH out of the Market.

61.     KidKraft's actions have actually harmed competition and consumers, by decreasing output of competitive kitchens, restricting consumer choice of wooden play kitchens, decreasing avenues for distribution, and artificially inflating the price consumers pay for wooden play kitchens.

62.     As a result of Kidkraft's abusive actions, Plaintiffs suffered economic damages, including compensatory and consequential damages.

WHEREFORE, Plaintiffs seek monetary damages, treble damages, reasonable attorney's

fees, court costs, interest, and any other relief this Court deems proper.

## COUNT III - CONCERTED REFUSAL TO DEAL
### (OJC & NH Against KidKraft)

63. Plaintiffs repeat and reallege paragraphs 1 through 40 hereof, as if fully set forth herein.

64. This action arises out of 15 U.S.C. § 15 that provides a civil remedy for a party that was injured due to a violation of 15 U.S.C. § 1.

65. At the Meeting, Defendants entered into an agreement to refuse to sell and boycott OJC, solely on the basis of it selling the competing Naomi Home Kitchen.

66. KidKraft has greater than 70% of the Market.

67. The agreement between Defendants was to cut off OJC's access to products and services it needs to compete.

68. Prior to KidKraft's termination of its business relationship with OJC in 2016, the Parties had a successful and profitable long term business relationship, dating back to September of 2011.

69. There was no valid business justification or procompetitive benefit for KidKraft's refusal to deal with OJC, aside from retaining its dominant market position, and stifling competition.

70. KidKraft's agreement with MidOcean has actually harmed competition and consumers, by decreasing output of competitive kitchens, restricting consumer choice of wooden play kitchens, decreasing avenues for distribution, and artificially inflating the price consumers pay for wooden play kitchens.

71. As a result of Defendants abusive actions, Plaintiffs suffered economic damages, including compensatory damages, and consequential damages.

WHEREFORE, Plaintiffs seek monetary damages, treble damages, cost of this suit, reasonable attorney's fees, and interest pursuant to 15 U.S. § 15(a).

### COUNT IV - CONSPIRACY TO COMMIT CONCERTED REFUSAL TO DEAL
### (OJC & NH Against MidOcean)

72. Plaintiffs repeat and reallege paragraphs 1 through 40 and 63 through 71 as if fully set forth herein.

73. Defendant MidOcean's conspiracy with KidKraft constitutes an illegal conspiracy to commit a concerted refusal to deal.

74. As a result of MidOcean's illegal agreement, Plaintiffs suffered economic damages, including compensatory and consequential damages.

WHEREFORE, Plaintiffs seek monetary damages, treble damages, cost of this suit, reasonable attorney's fees, and interest pursuant to 15 U.S. Code § 15(a).

### COUNT V - TORTIOUS INTERFERENCE WITH CONTRACT AND BUSINESS RELATIONSHIP
### (OJC against MidOcean)

75. Plaintiff OJC repeats and realleges paragraphs 1 through 40 hereof, as it fully set forth herein.

76. A long term business relationship existed between OJC and KidKraft, for KidKraft to fulfill OJC's purchase orders.

77. MidOcean knew about the business relationship between OJC and KidKraft.

78. MidOcean's actions at the Meeting were intended to induce KidKraft to terminate its business relationship with OJC.

79. KidKraft terminated its business relationship with OJC, as a result of MidOcean's inducement.

80. There was no legal justification for MidOcean's tortious actions.

81. As a result of MidOcean's wrongful actions, OJC suffered economic damages, including compensatory damages, special damages, and consequential damages.

WHEREFORE, Plaintiffs seek damages, special damages, consequential damages, punitive damages, together with court costs, interest, and any other relief this Court deems just and proper.

**PLAINTIFFS DEMANDS TRIAL BY JURY FOR ALL ISSUES TRIABLE BY RIGHT**

Dated: February 7, 2019

        Respectfully submitted,

        **BOIES SCHILLER FLEXNER LLP**

By: */s/Velvel Devin Freedman*
    Velvel (Devin) Freedman
    Florida Bar No. 99762
    **BOIES SCHILLER FLEXNER LLP**
    100 SE Second Street
    Miami, FL 33131
    Tel.   (305)539-8400
    Fax.   (305)539-1307
    Email: vfreedman@bsfllp.com

    Shlomo Y. Hecht, P.A.
    Florida Bar No.: 127144
    11651 Interchange Cir S
    Miramar, FL 33025
    Phone: 954-861-0025
    Fax: 615-413-6404

    Email: sam@hechtlawpa.com
    *Attorneys for Plaintiff*