**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 0:19-cv-60341-MGC**

OJ COMMERCE LLC; and
NAOMI HOME, INC.,

Plaintiffs

v.

KIDKRAFT, LP; and
MID-OCEAN PARTNERS, LP

    Defendants.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

I.     INTRODUCTION ................................................................................................ 1

II.    LEGAL STANDARD ......................................................................................... 2

III.   ARGUMENT ....................................................................................................... 3

    A.    Plaintiffs have adequately pled monopolization claims under Section 2 ................ 3

       i.    Plaintiffs have sufficiently plead monopoly power ................................................. 3

       ii.   Naomi Home has sufficiently alleged a Section 2 violation ................................... 6

       iii.  OJC has sufficiently alleged a Section 2 violation in the form of "a refusal to deal"
           under established precedent ..................................................................................... 8

          1.    Aspen Skiing controls ....................................................................................... 8

          2.    The decisions on which Defendants rely are distinguishable ........................ 12

    B.    Plaintiffs have sufficiently pled antitrust injury ................................................... 15

    C.    Plaintiffs have stated a claim of attempted monopolization ................................. 17

    D.    Plaintiffs have stated a claim under Section 1 ...................................................... 18

    E.    Plaintiffs have stated a claim of tortious interference ........................................... 19

IV.   CONCLUSION ................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                   **PAGE**

*Alcoa, Inc. v. Universal Alloy Corp.*
   No. 15-CV-01466, 2017 WL 2791055 (N.D. Ga. April 14, 2017)......................................... 19

*All Tag Corp. v. Checkpoint Sys., Inc.*
   No. 17-81261, 2018 WL 6514795, (S.D. Fla. Mar. 27, 2018) ................................. 4, 5, 19, 20

*Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*
   108 F.3d 1147 (9th Cir. 1997) ............................................................................................... 6

*Andrx Pharms., Inc. v. Elan Corp., PLC*
   421 F.3d 1227 (11th Cir. 2005) ............................................................................................ 3

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*
   472 U.S. 585 (1985)................................................................................................... passim

*Aspen Title & Escrow, Inc. v. Jeld-Wen, Inc.*
   677 F. Supp. 1477 (D. Or. 1987) ........................................................................................ 22

*B & D Nutritional Ingredients, Inc. v. Unique Bio Ingredients, LLC*
   No. 16-62364, 2017 WL 8751753 (S.D. Fla. Feb. 10, 2017) .................................................. 7

*Bell Atl. Corp. v. Twombly*
   550 U.S. 544 (2007)............................................................................................................. 3

*Broadcom Corp. v. Qualcomm Inc.,*
   501 F.3d 297 (3d Cir. 2007) ............................................................................................... 20

*Cobb Theatres III, Inc. v. AMC Entm't Holdings, Inc.*
   101 F. Supp. 3d 1319 (N.D. Ga. 2015) ........................................................................... 5, 19

*Copperweld Corp. v. Independence Tube Corp.*
   468 U.S. 752 (1984)........................................................................................................... 21

*Covad Commc'ns Co. v. Bellsouth Corp.,*
   374 F.3d 1044 (11th Cir. 2004) .................................................................................. 11, 12, 13

*Crossroads Cogeneration Corp. v. Orange & Rockland Utils.*
   159 F.3d 129 (3d Cir. 1998) ................................................................................................. 6

*DN Sports Performance Lab, Inc. v. Club Atlantis Condo. Ass'n, Inc.*
   219 So. 2d 107 (Fla. 3d DCA 2017) .................................................................................... 23

*Duty Free Americas v. Estee Lauder Cos.*
   797 F.3d 1248 (11th Cir. 2015) ................................................................................... passim

*E-One, Inc. v. Oshkosh Truck Corp.*
    No. 06CV1391, 2006 WL 3320441 (N.D. Ill. Nov. 13, 2006)................................... 16, 17

*Evergreen Partnering Grp. v. Pactiv Corp.*
    720 F.3d 33 (1st Cir. 2013).................................................................................. 7

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*
    721 F.3d 1281 (11th Cir. 2013) ........................................................................... 20

*Hamilton v. Suntrust Mortg., Inc.*
    6 F. Supp. 3d 1312 (S.D. Fla. 2014) .................................................................... 23

*Healthco Int'l, Inc. v. A-dec, Inc.*
    No. 87-0235, 1989 WL 104064 (D. Mass. April 17, 1989)..................................... 15

*Heavener, Ogier Servs., Inc. v. R.W. Fla. Region, Inc.*
    418 So. 2d 1074 (Fla. 5th DCA 1982) .................................................................. 24

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.*
    425 U.S. 738 (1976)............................................................................................ 3

*In re Blue Cross Blue Shield Antitrust Litig.*
    No. 13-CV-20000, 2017 WL 2797267 (N.D. Ala. June 28, 2017)............................. 3

*In re Sulfuric Acid Antitrust Litig.*
    743 F. Supp. 2d 827 (N.D. Ill. 2010) ................................................................... 22

*Iris Wireless LLC v. Syniverse Techs.*
    49 F. Supp. 3d 1022 (M.D. Fla. 2014).................................................................. 14

*Jacobs v. Tempur-Pedic Int'l, Inc.*
    626 F.3d 1327 (11th Cir. 2010) ........................................................................... 18

*Kaloe Shipping Co. v. Goltens Serv.*
    315 F. App'x 877 (11th Cir. 2009) ........................................................................ 3

*Levine v. Cent. Fla. Med. Affiliates, Inc.*
    72 F.3d 1538 (11th Cir. 1996) ............................................................................. 4

*Lockheed Martin Corp. v. Boeing Co.*
    390 F. Supp. 2d 1073 (M.D. Fla. 2005)............................................................. 5, 6

*Making Ends Meet, Inc. v. Cusick*
    719 So. 2d 926 (Fla. 3d DCA 1998) .................................................................... 23

*McArthur Dairy, LLC v. McCowtree Bros. Dairy, Inc.*
    No. 09-62033, 2011 WL 2118701 (S.D. Fla. May 27, 2011)................................... 22

iv

*McWane, Inc. v. FTC*
  783 F.3d 814 (11th Cir. 2015) ......................................................................... 4, 8, 9, 19

*Morris Commc'ns Corp. v. PGA Tour, Inc.*
  364 F.3d 1288 (11th Cir. 2004) ................................................................................. 11

*Niles Audio Corp. v. OEM Sys. Co., Inc.*
  174 F. Supp. 2d 1315 (S.D. Fla. 2001) ..................................................................... 23

*Pac. Bell. Tel. Co. v. LinkLine Commc'ns, Inc.*
  555 U.S. 438 (2009) ................................................................................................. 14, 15

*QSGI, Inc. v. IBM Glob. Fin.*
  No. 11-80880-CIV, 2012 WL 1150402 (S.D. Fla. Mar. 14, 2012) ............................. 6

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*
  899 F.2d 951 (10th Cir. 1990) ..................................................................................... 5

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*
  376 F.3d 1065 (11th Cir. 2004) ................................................................... 3, 17, 18, 19

*States v. Grinnell Corp.*
  384 U.S. 563 (1966) ...................................................................................................... 4

*T.V. Azteca S.A. de C.V. v. Telemundo Commc'ns Grp., Inc.*
  No. 06-CIV-22048, 2007 WL 970116 (S.D. Fla. Feb. 21, 2007) ............................. 24

*Timken Roller Bearing Co. v. FTC*
  299 F.2d 839 (6th Cir. 1962) ......................................................................... 15, 16, 17

*Tops Mkts., Inc. v. Quality Mkts., Inc.*
  142 F.3d 90 (2d Cir. 1998) .......................................................................................... 5

*Tyntect v. Syniverse Techs., LLC*
  No. 17-cv-591, 2017 WL 2733763 (M.D. Fla. June 26, 2017) ............................. 14, 16

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*
  7 F.3d 986 (11th Cir. 1993) ......................................................................................... 4

*United States v. Dentsply Int'l, Inc.*
  399 F.3d 181 (3d Cir. 2005) ................................................................................. 5, 7, 8

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*
  540 U.S. 398 (2004) ................................................................................................. 12, 13

*Weber v. Wynne*
  431 F. Supp. 1048 (D.N.J. 1977) ................................................................................. 6

**OTHER SOURCES**

Restatement (Second) of Torts § 769 cmt. d (1979) ...................................................................... 20

Plaintiffs OJ Commerce LLC ("OJC") and Naomi Home, Inc. ("NH") respectfully submit this memorandum in opposition to Defendants KidKraft, LP ("KidKraft") and Mid-Ocean Partners IV, L.P.'s ("MidOcean") Motion to Dismiss [ECF No. 15] ("Motion").

## I.    INTRODUCTION

KidKraft is an undisputed monopolist that controls more than 70% of the market for wooden play kitchens in the continental United States. Defendants sought to protect that monopoly by threatening dealers (and potential dealers) with termination if they carried NH's competing play kitchens. Defendants then delivered on their threat, terminating a longstanding course of profitable dealing with OJC because it did not capitulate to Defendant's illegal demands. In so doing, Defendants have violated federal antitrust law, causing injury to both OJC, a distributor of KidKraft's products, and NH, a rival of KidKraft.  The Complaint alleges not only injury to OJC and NH, but also harm to competition in the form of reduced choice and artificially inflated prices. *See* Compl. ¶¶ 50, 55, 61, 70.

Plaintiffs' allegations—which must be accepted as true for the purpose of this motion—are supported by **a smoking gun email** revealing KidKraft's true anticompetitive intent. But Defendants' conduct has also revealed their anticompetitive intent. In 2015, KidKraft informed OJC that it "must stop competing with KidKraft by selling the Naomi Home Kitchen or face termination of its relationship with KidKraft." This initial threat immediately hurt competition as NH had to scale back expansion. This worked for some time until KidKraft emailed OJC that KidKraft and MidOcean's boards had recently met and discussed NH's competition and its adverse effect on KidKraft's sales. On a phone call later that day, KidKraft issued OJC an ultimatum: stop selling NH's kitchens or be terminated as a KidKraft dealer. When OJC refused to buckle, KidKraft terminated its longstanding profitable business relationship with OJC.

But KidKraft did not stop there. Instead, it also leveraged its monopoly power to block NH's ability to access distribution channels to sell its competing play kitchens. Specifically, KidKraft threatened other retailers that they would lose access to KidKraft products if they carried NH's. In response, Costco refused to sell NH's products on very profitable terms, informing NH that it could not jeopardize its relationship with KidKraft.

As alleged in the Complaint, KidKraft's conduct not only injured OJC and NH, it also injured competition, restricting consumer choice and driving up prices, *see id.* ¶¶ 50, 55, 61, 70; it did so by eliminating OJC which provided "aggressive discounts to consumers" as an online retailer of KidKraft play kitchens and by blocking the growth of NH, a rival and competitive threat to KidKraft because NH's "own line of wooden play kitchens [was] priced below KidKraft's." *Id.* ¶¶ 16, 26.

Defendants' conduct is a textbook example of a refusal to deal under the standards articulated in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) and its progeny.[1] Defendants attempt to undercut Plaintiffs' well-plead antitrust allegations by relying on non-binding and outdated cases that are both factually and legally distinguishable is not persuasive. For these reasons and those discussed below, the Complaint should not be dismissed.

## II. LEGAL STANDARD

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

---

[1] Tellingly, Defendants relegate their perfunctory discussion of *Aspen Skiing* to a footnote. *See* ECF No. [15], at 8 n.3. **But KidKraft's own Code of Conduct demonstrates the clear applicability of *Aspen Skiing* to their conduct**: "Generally speaking, KidKraft is free to choose who we do business with, however, depending on the circumstances, legal issues may also arise if we refuse or otherwise terminate a business relationship with certain customers or competitors in certain instances." KidKraft Code of Conduct and Business Ethics § 19, available at https://www.kidkraft.com/media/wysiwyg/homepage/Code_of_Conduct_online.pdf.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding whether a complaint states a claim, courts "must accept the facts as pleaded to be true and resolve them in the light most favorable to the plaintiff." *Kaloe Shipping Co. v. Goltens Serv.*, 315 F. App'x 877, 879 (11th Cir. 2009).

"The Eleventh Circuit has held that 'Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases.'" *In re Blue Cross Blue Shield Antitrust Litig.*, No. 13-CV-20000, 2017 WL 2797267, at *2 (N.D. Ala. June 28, 2017) (quoting *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004)); *accord Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976) ("[I]n antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly."); *Andrx Pharms., Inc. v. Elan Corp., PLC*, 421 F.3d 1227, 1236 (11th Cir. 2005) (recognizing that "antitrust cases are 'fact-intensive,' and require appropriate market analysis, and therefore are typically inappropriate for a Rule 12 dismissal").

## III.   ARGUMENT

### A.  Plaintiffs have adequately pled monopolization claims under Section 2

A plaintiff states a claim for monopolization by pleading "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

### i.  Plaintiffs have sufficiently plead monopoly power

Monopoly power is "the power to raise prices to supra-competitive levels or . . . the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1554 (11th Cir. 1996). In this Circuit (and others), "[t]he principal measure of actual

monopoly power is market share . . . ." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 999 (11th Cir. 1993)), *cert. denied*, 519 U.S. 820 (1996). So much so that "[a] high market share is a rebuttable presumption of monopoly." *All Tag Corp. v. Checkpoint Sys., Inc.*, No. 17-81261, 2018 WL 6514795, at *3 (S.D. Fla. Mar. 27, 2018); *see Grinnell Corp.*, 384 U.S. at 571 (noting "[t]he existence of [monopoly] power ordinarily may be inferred from the predominant share of the market"); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) ("We have held that a market share of over 70 percent is usually 'strong evidence' of monopoly power.").

Defendants do not challenge Plaintiffs' definition of the relevant market or dispute that KidKraft controls over 70% of it. ECF No. [15], at 11–12. Plaintiffs' undisputed allegation that KidKraft has *more than* 70% of the relevant market is sufficient to withstand a motion to dismiss. *Dentsply Int'l, Inc.*, 399 F.3d at 188 (market share between 75–80% "more than adequate to establish a prima facie case of [monopoly] power."); *Cobb Theatres III, Inc. v. AMC Entm't Holdings, Inc.*, 101 F. Supp. 3d 1319, 1340 (N.D. Ga. 2015) ("whether a 69% share of the market supports a finding of monopoly power is a borderline issue . . . [but] the allegation at least withstands Defendants' motion to dismiss.").

To be sure, high market share doesn't constitute *irrefutable* evidence of monopoly power; extremely low barriers to entry *could* potentially cut against a high market share. *See Lockheed Martin Corp. v. Boeing Co.*, 390 F. Supp. 2d 1073, 1078 (M.D. Fla. 2005). But high market share does create "a rebuttable presumption of monopoly [power]." *All Tag*, 2018 WL 6514795, at *3; *see Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 968 (10th Cir. 1990) ("market share percentages may give rise to presumptions . . ."); *Weber v. Wynne,* 431 F. Supp. 1048, 1054-55 (D.N.J. 1977) (77% market share raised rebuttable presumption of monopoly power). Here, Defendants have done nothing to refute this presumption. Instead, Defendants try to impermissibly shift the burden to Plaintiffs to negate the possibility that there are low barriers to

entry, which might rebut the presumption of monopoly power created by Defendants' high market share. ECF No. [15], at 13. That's not Plaintiffs' burden, and this Court should not accept Defendants' argument.[2]

In any event, drawing all reasonable inferences in Plaintiffs' favor as required on a motion to dismiss,[3] Plaintiffs' Complaint includes allegations that demonstrate there are barriers to entry into the market. These include (1) wooden play kitchens require special production facilities, Compl. ¶ 17, (2) the requirement of a nation-wide distribution network, *id.* ¶ 22, and (3) KidKraft's dominant position in the national market, *id.* ¶ 23. Thus, Plaintiffs have sufficiently alleged monopoly power. *See also United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) (exclusionary policies created barriers to entry for competitors).

---

[2] The cases Defendants cite do not advance their argument.  In *Lockheed Martin Corp.*, the court did not dismiss the claim for failure to allege barriers to entry. 390 F. Supp. at 1079 n.6. In *Crossroads Cogeneration Corp. v. Orange & Rockland Utils.*, 159 F.3d 129, 141–42 (3d Cir. 1998), the plaintiff failed to allege either the defendant's market share or barriers to entry. But here, Plaintiffs did much more than that, alleging both the Defendants' 70% market share and "the nature of the anticompetitive conduct," Compl. ¶¶ 13, 24–39, "the elasticity of consumer demand," *id.* ¶19 (applying SSNIP test), and the anti-competitive effect of Defendants' conduct, *id.* ¶¶ 50, 55, 61, 70.  Additionally, *Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147 (9th Cir. 1997), is not on point because that opinion followed a full trial.  Moreover, the only barrier to entry upon which plaintiff relied was the defendant's high quality product. *Id.* at 1155. Finally, *QSGI, Inc. v. IBM Glob. Fin.*, No. 11-80880-CIV, 2012 WL 1150402, *3 (S.D. Fla. Mar. 14, 2012), does not help Defendants because there the plaintiff neither identified a relevant market nor made specific allegations of antitrust injury.

[3] *See B & D Nutritional Ingredients, Inc. v. Unique Bio Ingredients, LLC*, No. 16-62364, 2017 WL 8751753, at *1 (S.D. Fla. Feb. 10, 2017) ("When considering a motion to dismiss . . . . the court must draw all reasonable inferences in favor of the plaintiff."); *Evergreen Partnering Grp. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) ("It is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences, since those questions are properly left to the factfinder.")

### ii.   Naomi Home has sufficiently alleged a Section 2 violation

As demonstrated above, NH has adequately alleged KidKraft possesses monopoly power. NH has also adequately alleged Defendants' willful acquisition and maintenance of that monopoly power through anticompetitive, exclusionary conduct; to wit, Defendants' refusal to deal with any retailer that carries the Naomi Home Kitchen.

The Eleventh Circuit has held that a monopolist violates Section 2 by excluding its competitors from the most efficient distribution channels—*i.e.*, the ones necessary to become effective competitors. *McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015) ("[A]n exclusive dealing arrangement can be harmful when it allows a monopolist to maintain its monopoly power by raising its rivals' costs sufficiently to prevent them from growing into effective competitors.").[4] In *McWane*, shortly after the plaintiff manufacturer entered the market, the defendant manufacturer implemented a policy refusing to deal with any distributor who purchased product from anyone but defendant. *Id.* at 820–21. As a result of defendant's policy, other distributors purchased exclusively from defendant to avoid "the devastating result of being cut off" by defendant. *Id.* The FTC brought an enforcement action alleging, *inter alia*, that defendant's policy constituted an unlawful maintenance of a monopoly over the relevant market. *Id.* at 823.  The FTC found that defendant's policy was an unlawful exclusive dealing arrangement that foreclosed the plaintiff's access to distributors and harmed competition, thereby contributing significantly to the maintenance of the defendant's monopoly power in the market. *Id.*

On appeal, the Eleventh Circuit affirmed the FTC's finding that defendant's exclusive dealing policy made it "infeasible for distributors to drop the monopolist [defendant] and switch to

---

[4] The *McWane* court affirmed an order finding unlawful monopoly maintenance under Section 5 of the FTC Act. Section 5 monopoly claims are analyzed under the same standards as Section 2 of the Sherman Act. *See id.* at 828.

[plaintiff] . . . [which then forced plaintiff] to rely on inefficient outsourcing arrangements and prevent[ed] it from providing meaningful price competition with [defendant]." *Id.* at 823, 838; *accord Dentsply Int'l, Inc.*, 399 F.3d at 193 ("That some manufacturers resort to direct sales and are even able to stay in business by selling directly is insufficient proof that direct selling is an effective means of competition. The proper inquiry is not whether direct sales enable a competitor to 'survive' but rather whether direct selling 'poses a real threat' to defendant's monopoly.").

Here, as in *McWane*, Defendants responded to competition from NH by initiating a policy whereby they refused to deal with any retailer that carried NH's products. Compl. ¶¶ 28, 32–39; Ex. A. And, like *McWane*, the express purpose of Defendants' policy was to harm competition by preventing NH from becoming a viable competitor in the market. *Id.* Predictably, other retailers— just like the distributors in *McWane*—bowed to Defendants' threat and refused to buy from NH to avoid "the devastating result of being cut off" from KidKraft. *Id.* ¶¶ 37–38.

Tellingly, Defendants ignore most of the Complaint's allegations as to NH, and distort those they do address. They contend (*see* ECF No. [15], at 9) that Plaintiffs do not allege "KidKraft took any action that prompted Costco's decision," a claim that rests on a strained, implausible, and self-serving reading of the allegation in the Complaint regarding what Costco told Plaintiffs.  *See* Compl. ¶ 38; cases cited *supra* note 3.  Relatedly, Defendants also contend (*see* ECF No. [15], at 9) that Plaintiffs do not claim "KidKraft's alleged refusal to sell its toy kitchens to OJC had any impact on Naomi Home's ability to sell toy kitchens to Costco." But again, this argument ignores the allegation that KidKraft strong-armed retailers such as Costco not to carry NH's competing play kitchens.

### iii.  OJC has sufficiently alleged a Section 2 violation in the form of "a refusal to deal" under established precedent

The Complaint plausibly alleges KidKraft unlawfully maintained its monopoly over the market for wooden play kitchens by terminating a profitable and longstanding course of dealing and refusing to deal with OJC for anticompetitive reasons. These facts are on all fours with the paradigmatic course-of-dealing case, *Aspen Skiing*, and Eleventh Circuit cases following it. None of the authorities on which Defendants rely justify dismissal of Plaintiffs' claims.

#### 1.  *Aspen Skiing controls*

In *Aspen Skiing*, three independently-owned ski resorts in Colorado developed a system under which skiers could purchase an "all-Aspen" pass that would allow skiers to access all three resorts. *Id.* at 587–89. For a number of years, the competing owners all sold the joint ticket. *Id.* One of the resort owners, Ski. Co., subsequently gained control of two of the three resorts and opened a fourth. *Id.* at 589–90. Ski Co. then unilaterally discontinued the "all-Aspen" pass and withdrew from this established course of dealing with the final ski resort owner, "Highlands." *Id.* 591–94. Instead, Ski Co. extended to Highlands "an offer that [it] could not accept": Ski Co. would continue the program only if Highlands agreed to accept a large cut in revenue. *Id.* at 592. When Highlands rejected this offer, Ski Co. took actions that "made it extremely difficult" for Highlands to compete. *Id.* at 593.

Ski Co. argued it had no duty to continue dealing with its rival. The Supreme Court, however, held that a company's right to choose with whom it will deal is not unqualified. *Id.* at 601–02. It found sufficient evidence that Ski Co.'s unreasonable conduct reflected an anticompetitive motivation and upheld a jury's verdict for Highlands. *Id.* at 610–11. The Court reasoned that Ski Co. had engaged in anticompetitive conduct by terminating the "all-Aspen" program because Ski Co. "did not merely reject a novel offer to participate in a cooperative venture that had been

8

proposed by a competitor. Rather, the monopolist elected to make an important change in the pattern of distribution that had originated in a competitive market and had persisted for several years." *Id.* at 603. In determining whether Ski Co. excluded its rival on some basis other than efficiency, the Court examined the effect of Ski Co.'s conduct on (1) consumers, (2) Highlands, and (3) on Ski Co. itself. *Id.* at 605. The Court noted customers' preferred the "all-Aspen" pass, the change had an adverse impact on Highlands, and that Ski Co.'s lack of pro-competitive justifications for its change "support[ed] an inference that Ski Co. was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer good will in exchange for a perceived long-run impact on its smaller rival." *Id.* at 610–11.

The Eleventh Circuit has indicated that anticompetitive intent alone suffices to bring a monopolist's refusal to deal within the purview of *Aspen Skiing*. *See Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004) ("Two theories exist upon which to predicate a unilateral refusal to deal claim . . . . Under the intent test, it is unlawful for a monopolist to maintain or extend its monopoly power by intentionally engaging in conduct that unnecessarily excludes competitors and impairs competition."). To help determine when anticompetitive intent is present, the Eleventh Circuit has provided three factors to review. *See Covad Commc'ns Co. v. Bellsouth Corp.*, 374 F.3d 1044, 1048 (11th Cir. 2004).

As detailed below, the Defendants' conduct here leaves no room for doubt that they had anticompetitive intent and that their refusal is therefore illegal under *Aspen Skiing*. *See Morris*, 364 F.3d at 1294. Nevertheless, Plaintiffs have alleged each of the three factors *Covad* analyzed.

First, and most importantly, a plaintiff must allege a "unilateral termination of a voluntary course of dealing" by defendant. *Duty Free Americas v. Estee Lauder Cos.*, 797 F.3d 1248, 1266–67 (11th Cir. 2015) (quoting *Covad*, 374 F.3d at 1049); *see also Aspen Skiing*, 472 U.S. at 603 ("monopolist elected to make an important change in a pattern of distribution that had originated

9

in a competitive market and had persisted for several years"). Here, the Complaint plainly alleges the termination of a long-term, voluntary, and profitable course of dealing between the parties– for no other reason than Kidkraft's desire to suppress competition. Specifically, the Complaint alleges that for many years prior to KidKraft's illegal refusal to deal, OJC and KidKraft had a voluntary and profitable business relationship where OJC would sell KidKraft's products. Compl. ¶¶ 25–26. The Complaint further alleges that in 2016 KidKraft terminated this longstanding profitable relationship and refused to deal with OJC for the sole purpose of eliminating the Naomi Home Kitchen from the marketplace. *Id.* ¶¶ 28, 31–37. This unjust termination "suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Duty Free Americas,* 797 F.3d at 1266 (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko,* 540 U.S. 398, 409 (2004)).

Second, the Eleventh Circuit examines "pricing behavior" to determine whether a plaintiff's allegations "support the requisite monopolistic intent." *Covad,* 374 F.3d at 1048; *see Duty Free Americas*, 797 F.3d at 1267. For example, in *Aspen Skiing*, Ski. Co. refused to deal with Highlands, even when the Highlands offered to compensate Ski Co. at the price Ski Co. charged its ordinary customers. *Duty Free Americas,* 797 F.3d at 1267 (citing *Trinko*, 540 U.S. at 409); *see Aspen Skiing*, 472 U.S. at 608 ("The jury may well have concluded that Ski. Co. elected to forgo these short-run benefits because it was more interested in reducing competition in the Aspen market over the long run by harming its smaller competitor."). Here, KidKraft's "pricing behavior" also "support[s] the requisite monopolistic intent." Just as Ski Co. refused to deal with its rival even if compensated at its standard offering price, KidKraft refused to deal with OJC, even at the price KidKraft charged other retailers. Compl. ¶¶ 47, 57; *see Duty Free Americas*, 797 F.3d 1268. Defendants' "unwillingness [to sell to OJC] *even if compensated at retail price* reveal[s] a distinctly anticompetitive bent." *See Trinko*, 540 U.S. at 409.

10

Third, the Eleventh Circuit considers whether a defendant refused to deal in a product already being sold in a retail market. *Covad*, 374 F.3d 1048 ("[*Aspen Skiing*] involved a defendant whose failure to sell even at retail cost to a competitor was a failure to sell *otherwise publicly marketed services*."); *cf. Trinko*, 540 U.S. at 399 ("[T]he *Aspen* defendant refused to provide its competitor with a product it already sold at retail, whereas here the unbundled [telecom network] elements offered pursuant to [The Telecommunications Act] are not available to the public, but are provided to rivals under compulsion and at considerable expense."). This factor, too, demonstrates the viability of Plaintiffs' refusal to deal claim because there is no question that KidKraft's products are sold both wholesale and for retail. Compl. ¶¶ 4, 21, 38.

But as mentioned above, in this case, Plaintiffs' allegations obviate the need to draw an "inference" of Defendants' monopolistic intent. Rather, there is direct evidence of monopolistic intent, including Kidkraft's repeated threats to terminate OJC unless it stopped selling NH's competing kitchens, Compl. ¶ 28. The Complaint attaches a 2016 **smoking gun e-mail** from KidKraft to OJC admitting that "the topic of the Naomi Kids Brand came up" at Defendants' board meeting, that KidKraft had noticed a "decline in sales" as a result of the Naomi Home brand competition, and that KidKraft wanted a call with OJC about this issue. Compl. at Ex. A. The Complaint alleges KidKraft then told Plaintiffs that OJC and NH must stop competing with KidKraft or KidKraft would cut off millions of dollars in profitable sales to OJC. *Id.* ¶¶ 33–34.

In short, the Complaint epitomizes "[t]he unilateral termination of a voluntary course of dealing designed to achieve an anticompetitive end." *See Duty Free Americas*, 797 F.3d at 1266–67. On this record it is clear that KidKraft's refusal to deal "was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer good will in exchange for a perceived long-run impact on its smaller rival." *Aspen Skiing* 472 U.S. at 610–11; *see also Iris Wireless LLC v. Syniverse Techs.*, 49 F. Supp. 3d 1022, 1029 (M.D. Fla. 2014) (declining to

11

dismiss a refusal to deal claim under the *Aspen Skiing* exception where plaintiff alleged (i) the unilateral termination of a mutually beneficial course of dealing and where (ii) defendant had no legitimate procompetitive justification); *Tyntect v. Syniverse Techs., LLC*, No. 17-cv-591, 2017 WL 2733763, at *5–6 (M.D. Fla. June 26, 2017) (same); *Morris*, 364 F.3d at 1294.

### 2.   *The decisions on which Defendants rely are distinguishable*

Defendants' invocation of the "general rule"—that a firm may freely exercise its independent discretion as to parties with whom it will deal—like Defendants' reliance on *Trinko* and *Pac. Bell. Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438 (2009)—is fundamentally misplaced. First, the Supreme Court has drawn a clear distinction between a duty to deal mandated by the government— as in *Trinko* and *LinkLine*—and an antitrust duty to continue to deal based on a prior and voluntary course of dealing, as in *Aspen Skiing*. The Eleventh Circuit has recognized this distinction and explained "*Trinko* now effectively makes the unilateral termination of a *voluntary* course of dealing a requirement for a valid refusal-to-deal claim under [*Aspen Skiing*]. *Duty Free Americas*, 797 F.3d at 1266–67 (emphasis added). In *Trinko* and *Linkline*, defendants were *compelled* by law to sell to competitors in a wholesale market and as such had no antitrust duty to plaintiffs. *Trinko*, 540 U.S. at 402–03, 409–10; *LinkLine*, 555 U.S. at 450. But here, as in *Aspen Skiing*, Defendants unilaterally terminated "a voluntary (*and thus presumably profitable*) course of dealing," which "suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *See Duty Free Americas*, 797 F.3d at 1266 (quoting *Trinko*, 540 U.S. at 409); Compl. ¶¶ 24–25, 36. Defendants' attempt to shield their anticompetitive conduct behind an appeal to the "general rule" is unavailing.

Finally, Defendants cite to a Sixth Circuit case decided more than two decades before the *Aspen Skiing* exception was handed down as well as two district court cases from outside the Eleventh

Circuit—of which only one even mentions *Aspen Skiing*. But each of these "divided loyalty" cases are both legally and factually distinguishable.

In *Timken Roller Bearing Co. v. FTC*, 299 F.2d 839 (6th Cir. 1962), the Sixth Circuit set aside an FTC order compelling Timken to cease and desist its refusal to deal with distributors that sold its competitors goods. This pre-*Aspen Skiing* decision is premised on an evidentiary record that demonstrated Timken hadn't actually refused to deal with anyone. *Id.* at 842. Specifically, the court noted that (1) almost every Timken distributor testified they felt free to, and had, carried competing products; (2) every distributor Timken terminated was actually let go for a different, legitimate, reason; and (3) numerous Timken officials testified they didn't have an exclusive dealing policy. *Id.* at 841–42. Similarly, *Healthco Int'l, Inc. v. A-dec, Inc.*, No. 87-0235, 1989 WL 104064 (D. Mass. April 17, 1989) is both legally and factually distinguishable. In *Healthco*, the plaintiff distributor had begun a campaign of getting customers to switch from defendant's products to its own through tactics that harmed defendant. *Id.* at *2. Based on this evidence, the court ruled, *on summary judgment*, that there was no illegal, anticompetitive, action. *Id.* at 8.[5]

Thus, both these cases are inapposite. Both were reviewing and construing the evidentiary record, something not permitted here on a motion to dismiss, where the Court must accept Plaintiffs allegations as true and interpret them in the most favorable light for Plaintiffs, *i.e.,* that KidKraft is refusing to deal with OJC or any retailer carrying NH products (*see* Compl. ¶¶ 28, 34, 37–38) and that KidKraft terminated its prior course of dealing with OJC for the anticompetitive

---

[5] To the extent Defendants attempt to proffer a valid business justification for their refusal to deal with OJC, *see* ECF No. [15], at 10–11, this is a factual question not appropriate for resolution at the motion to dismiss stage. *See Tyntec Inc.*, 2017 WL 2733763, at *7 ("[A] motion to dismiss cannot address matters requiring resolution of factual disputes."); *accord Morris*, 364 F.3d at 1294–96 (affirming summary judgment in favor of defendant based on defendant's proffered business justification for alleged refusal to deal).

reason of its refusal to stop competing, and not because OJC was an inefficient retailer of KidKraft's products (*id*. ¶¶ 28, 34–36; Ex. A). Further, *Timken* pre-dates *Aspen Skiing*.

The third "divided loyalty" case cited by Defendants, *E-One, Inc. v. Oshkosh Truck Corp.*, No. 06CV1391, 2006 WL 3320441 (N.D. Ill. Nov. 13, 2006), is not on point either. The plaintiff car manufacturer sought to contract with a dealer in the Chicago region. *Id.* On the day plaintiff and the Chicago dealer were to sign a contract memorializing this arrangement, the defendant (also a car manufacturer) called the Chicago dealer and threatened to cancel its $17 million service contract with the dealer if it signed a contract with plaintiff. *Id.* Additionally, the dealer's other customers, due to pressure from defendant, threatened the dealer with adverse consequences if it finalized the contract with plaintiff. *Id.* Consequently, the dealer refused to deal with the plaintiff. *Id.* at *2. Plaintiff sued defendant and the court, citing *Timken*, granted defendant's motion to dismiss plaintiff's claim for attempted monopolization. The court reasoned that the defendant was free not to finalize its relationship with the Chicago dealer because if (under *Timken*) "a defendant cannot be compelled to maintain such a relationship with a dealer, the antitrust laws certainly do not mandate one with a service provider." *Id.* But undercutting any persuasive value it might otherwise have had, the *E-One* court failed to consider *Aspen Skiing* in rendering its decision, and instead relied exclusively on the outdated *Timken* precedent when granting the defendant's motion to dismiss. *See id.* at *3. But, even if the court had applied *Aspen Skiing*, the factual circumstances of *E-One* are plainly distinguishable from those present here. Critically, unlike OJC in the present case, the plaintiff in *E-One* had no existing voluntary course of dealing with either the defendant or the dealer. *See id.* at *1; *see also Duty Free Americas,* 797 F.3d at 1266–67 (a plaintiff must allege a "unilateral termination of a voluntary course of dealing" by defendant). This Court should therefore decline to follow this non-binding, out of circuit, and poorly-reasoned opinion.

14

**B.  Plaintiffs have sufficiently pled antitrust injury**

Contrary to Defendants' contention, Plaintiffs' have sufficiently pled harm to competition. *See Spanish Broad.*, 376 F.3d at 1071 ("In alleging the anticompetitive effect of the defendant's conduct, an antitrust plaintiff must show harm to competition rather than to competitors.") (quotation marks omitted). A plaintiff must either allege actual or potential harm to competition. *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010). Actual harm to competition "is indicated by a factual connection between the alleged harmful conduct and its impact on competition in the market, and the plaintiff claiming it should point to the specific damage done to consumers in the market." *Id.* (quotation marks and citations omitted). "Actual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality." *Id.* To allege potential harm, a plaintiff must first "define the relevant market and establish that the defendants possess[] power in that market" and then must "make specific allegations linking market power to harm to competition in that market." *Id.* (quotation marks omitted).

Plaintiffs sufficiently allege both actual and potential harm to competition. Rather than alleging only harm to OJC and NH, Plaintiffs allege Defendants' refusal to deal was "designed solely to gain greater market share, drive up prices, and eliminate price competition," and that Defendants' actions have actually harmed competition by (1) decreasing output of competitive wooden kitchens, (2) restricting consumer choice of wooden play kitchens, (3) decreasing avenues for distribution, and (4) artificially inflating the price consumers pay for wooden play kitchens." Compl. ¶¶ 48, 50, 59, 61, 70.  These allegations go far beyond the allegations in *Spanish Broad.*, 376 F.3d at 1072, 1076–77, where the plaintiff alleged it had suffered "weakened stock prices, restricted access to capital markets, loss of employees, damaged reputation, and loss of advertising revenue" but did not allege harm to competition either in term of increased prices or reduced

choice, *id.* at 1079 (noting plaintiff failed to allege "prices have actually risen or that the quantity of available Spanish-language advertising time has actually decreased"). The allegations here demonstrate the requisite connection between Defendants' refusal to deal with OJC and the ensuing impact on competition. *See All Tag Corp*, 2018 WL 6514795, at *5 (allegations of reduction of consumer choice in relevant market sufficiently plead competitive harm); *Alcoa, Inc. v. Universal Alloy Corp.*, No. 15-CV-01466, 2017 WL 2791055, at * 5 (N.D. Ga. April 14, 2017) (allegations that counterclaim defendant was harming competition by (1) substantially diminishing the quality of good offered to the public, (2) dramatically raising the prices charged to consumers, and (3) potentially forcing defendant from the market were sufficient to allege harm to competition); *Cobb Theatres III*, 101 F. Supp. at 1335 (allegations that restriction of consumer choice forced consumers to purchase a product that was less desirable and of inferior quality were sufficient to allege harm to competition).

Defendants' argument that competition cannot plausibly be harmed by the elimination of one retailer (*see* ECF No. [15], at 17) not only ignores the harm to competition by thwarting the growth of NH, Kidkraft's rival, but is also contrary to Eleventh Circuit case law. *See Spanish Broad.*, 376 F.3d at 1072–73 (allegations of damage to a single competitor, coupled with allegations of harm to competition in general are sufficient); *see McWane*, 783 F.3d 814 (affirming FTC ruling in an antitrust case after a two-month trial and finding injury to completion on the basis of a single excluded rival). The elimination of a competitor can hurt competition, especially when that competitor is a trend setter, and especially when, as is the case here, Defendants have targeted both an important distributor and a key up-and-coming rival. Otherwise, a monopolist would be free to box all its remaining competitors from the market one-by-one with impunity because the marginal effect on competition from the elimination of a single competitor, would be, according to KidKraft, simply too small to matter. *See All Tag Corp.*, 2018 WL 6514795, at *4 (denying motion to

16

dismiss, despite defendant's argument that plaintiff failed to plead antitrust injury because other competitors, including plaintiff, had been able to enter the market, no competitors had gone out of business, and plaintiff remained a viable competitor).

### C.  Plaintiffs have stated a claim of attempted monopolization

A plaintiff states a claim for attempted monopolization by pleading "(1) that the defendant has engaged in anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Duty Free Americas*, 797 F.3d at 1263. As demonstrated above, Plaintiffs have properly pled the first two factors of anticompetitive conduct and a specific intent to monopolize. Compl. ¶¶ 28, 34–36; Ex. A; *see supra* Section III.A.

Contrary to Defendants' contention, Plaintiffs have adequately alleged a dangerous probability of success.  A dangerous probability of achieving monopoly power "arises when the defendant comes close to achieving monopoly power in the relevant market." *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 721 F.3d 1281, 1285 (11th Cir. 2013). Whether this probability exists is a particularly fact-intensive inquiry that "[c]ourts typically should not resolve . . . at the pleading stage unless it is clear on the face of the complaint that the 'dangerous probability' standard cannot be met as a matter of law." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 318 (3d Cir. 2007). Relevant factors to this inquiry include a defendant's "significant market share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand . . ." *Id.*

Here, KidKraft's undisputed 70% share of the relevant market weighs heavily in favor of finding a dangerous probability of KidKraft achieving monopoly power in the market. *See Duty Free Americas*, 797 F.3d at 1264 ("A dangerous *probability* of achieving monopoly power may be established by a 50% share of the relevant market.") (quoting *U.S. Anchor*, 7 F.3d at 1000). Coupled with Plaintiffs' allegations of Defendants' anticompetitive practices and the existence of

barriers to entry, *see supra* at III.A.i, "it is by no means clear on the face of the complaint that the 'dangerous probability' standard cannot be met as a matter of law." *See Broadcom Corp.*, 501 F.3d at 319.

### D.  Plaintiffs have stated a claim under Section 1

Defendants argue Counts III and IV of the Complaint should be dismissed because MidOcean is a majority owner of KidKraft, and therefore cannot conspire with KidKraft for purposes of Section 1 liability. *See* ECF No. [15], at 14. This argument fails for two reasons. First, Defendants improperly introduce factual matter not contained in the Complaint. *See id.* Second, the Supreme Court has identified only two types of combinations as "per se" incapable of conspiracy under the Sherman Act: (1) a corporation and one of its unincorporated divisions, and (2) a parent company and its wholly owned subsidiary. *See Am. Needle, Inc. v. Nat'l Football* League, 560 U.S. 183, 195–196 (2010) (citing *Copperweld Corp. v. Independence Tube Corp.*, 468 U.S. 752, 770–71 (1984)). The status of other combinations, such as the combination here, is fact-dependent, and so not susceptible to resolution on a motion to dismiss, absent detailed allegations about the combination, which are missing here. *See id.*; *accord McArthur Dairy, LLC v. McCowtree Bros. Dairy, Inc.*, No. 09-62033, 2011 WL 2118701, at *3 (S.D. Fla. May 27, 2011) (Cooke, J.) ("The criteria measuring the 'separateness' of a subsidiary from its parent company to determine whether there is an exception to the 'single entity' test include whether the subsidiary has separate control of its day-to-day operations, separate offices, separate corporate headquarters, and so forth.") (citing *Copperweld*, 486 U.S. at 772 n.18). Indeed, courts have held that similarly related entities can conspire with each other. *See In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 884–87 (N.D. Ill. 2010) (stating that courts have found majority shareholders capable of conspiring with the subsidiary); *Aspen Title & Escrow, Inc. v. Jeld-Wen, Inc.*, 677 F. Supp. 1477, 1486 (D. Or.

Case 0:19-cv-60341-MGC   Document 16   Entered on FLSD Docket 04/15/2019   Page 25 of 27

1987) ("[O]nly corporations which are owned 100% in common, or a *de minimis* amount less than 100%, are covered by the *Copperweld* rule.").

### E.  Plaintiffs have stated a claim of tortious interference

A plaintiff states a claim for tortious interference with a contractual or business relationship by pleading "1) the existence of a business relationship between the plaintiff and a third person . . . under which the plaintiff has legal rights, 2) the defendant's knowledge of the relationship, 3) an intentional and unjustified interference with the relationship by the defendant which induces or otherwise causes the third person not to perform, and 4) damage to the plaintiff resulting from the third person's failure to perform." *DN Sports Performance Lab, Inc. v. Club Atlantis Condo. Ass'n, Inc.*, 219 So. 2d 107, 110 (Fla. 3d DCA 2017).  Defendants do not dispute that Plaintiffs have sufficiently pled each element.

Instead, Defendants invoke a so-called "privilege to interfere" based on their assertion that "MidOcean is the majority and controlling owner of KidKraft" and that, for this reason, MidOcean's interference cannot be "unjustified" as a matter of law. ECF No. [15], at 16; *see Hamilton v. Suntrust Mortg., Inc.*, 6 F. Supp. 3d 1312, 1320 (S.D. Fla. 2014) (describing the "privilege to interfere"). This argument fails for two reasons. First, Defendants improperly raise facts not pled in the Complaint by alleging the ownership structure of KidKraft and MidOcean. *Niles Audio Corp. v. OEM Sys. Co., Inc.*, 174 F. Supp. 2d 1315, 1317 (S.D. Fla. 2001) ("In deciding a motion to dismiss, a court can only examine the four corners of the complaint.").

Second, even if MidOcean is a "non-stranger" to KidKraft's business relationship with OJC, MidOcean may still be liable if it interfered in bad faith. *See Hamilton*, 6 F. Supp. 3d at 1320 (parties are disqualified from asserting the "privilege to interfere" if they act maliciously or with conspiratorial motives); *Making Ends Meet, Inc. v. Cusick*, 719 So. 2d 926, 928 (Fla. 3d DCA 1998) (stating that the "qualified privilege" to interfere "carries with it the obligation to employ

19

means that are not improper"); RESTATEMENT (SECOND) OF TORTS § 769 cmt. d (1979) ("Also wrongful is the use of unlawful means such as an illegal boycott or conduct in restraint of competition or productive of an illegal monopoly."). Here, Plaintiffs allege MidOcean induced KidKraft to terminate its business relationship with OJC with anticompetitive intent and in violation of Federal Antitrust Statutes. Compl. ¶¶ 32–36, 78–80. These allegations are sufficient to show that MidOcean's actions were not justified or privileged.[6] *See Heavener, Ogier Servs., Inc. v. R.W. Fla. Region, Inc.*, 418 So. 2d 1074, 1077 (Fla. 5th DCA 1982) ("[T]he interferer's actions are tortious and actionable if the motive is purely malicious and not coupled with any legitimate competitive economic interest."). For this same reason, Defendants' assertion that Plaintiffs have not alleged an underlying tort also falls flat. *See id.* Plaintiffs' claim for tortious interference should not be dismissed.

## IV.   CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss.[7]

---

[6] To the extent Defendants argue MidOcean's interference was justified and privileged, "the defense of justification is an affirmative defense . . . [that] deals with questions of fact which are in dispute and thus cannot be resolved on a Motion to Dismiss." *See T.V. Azteca S.A. de C.V. v. Telemundo Commc'ns Grp., Inc.*, No. 06-CIV-22048, 2007 WL 970116, at *6 (S.D. Fla. Feb. 21, 2007) (citing cases).

[7] Defendants argue the Complaint should be dismissed with prejudice. For the reasons stated herein, Plaintiffs believe Defendants' motion to dismiss should be denied. But if the Court finds otherwise, Plaintiffs respectfully request leave to amend. *See Spanish Broad.*, 376 F.3d at 1070 (dismissal with prejudice is only proper "if it appears beyond doubt that [plaintiff] can prove no set of facts which would entitle it to relief").

Dated: April 15, 2019

Respectfully submitted,

By: */s/Velvel Devin Freedman*
Velvel (Devin) Freedman
Florida Bar No. 99762
Carl Goldfarb
Florida Bar No. 0125891
Robert G. Keefe
Florida Bar No. 1010751
Laselve E. Harrison
Florida Bar No. 112537
BOIES SCHILLER FLEXNER LLP
100 SE Second Street
Miami, FL 33131
Tel.  (305)539-8400
Fax. (305)539-1307
Email: vfreedman@bsfllp.com
Email: cgoldfarb@bsfllp.com
Email: rkeefe@bsfllp.com
Email: lharrison@bsfllp.com

Shlomo Y. Hecht, P.A.
Florida Bar No.: 127144
11651 Interchange Cir S
Miramar, FL 33025
Phone: 954-861-0025
Fax: 615-413-6404
Email: sam@hechtlawpa.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 15, 2019, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being

served this day on all counsel of record via transmission of Notices of Electronic Filing generated

by CM/ECF.

*/s/ Velvel Freedman*
VELVEL (DEVIN) FREEDMAN

21