UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 0:19-cv-60341-MGC

OJ COMMERCE LLC; and
NAOMI HOME, INC.,

    *Plaintiffs*

v.

KIDKRAFT, LP; and
MID-OCEAN PARTNERS, LP

    *Defendants.*

### PLAINTIFFS' *EXPEDITED MOTION*[1] TO COMPEL AND REQUEST FOR DISCOVERY HEARING[2]

Pursuant to Fed. R. Civ. P. 37(c) and L.R. 7.1, Plaintiffs OJ Commerce (OJC) and Naomi Home (NH) submit this Expedited Motion to Compel and request a hearing.

They say actions speak louder than words. In this complex antitrust case, a mere *ten days before* moving for summary judgment, and *forty-two days after* representing to this Court that their document productions were "complete" (in a disingenuous effort to defeat Plaintiffs' motion to extend discovery), Defendants sandbagged Plaintiffs with 1,277 new documents. This was their largest single-day production—and which constitutes 22% of their entire total production of 5,918 documents. What Defendants' sandbagging says is that they have a win-at-all-costs strategy, regardless of the principles of fairness, transparency, and professionalism.

At heart of this antitrust case is Defendants' motive to preserve their lucrative monopoly over the market for wooden play kitchens in the United States by hook or by crook. In July 2015, MidOcean, a private equity firm, became the majority owner of KidKraft.

---

[1] **Request for Expedited Ruling**: Pursuant to L. R. 7.1(b)(2), Plaintiffs seek an expedited ruling **by June 19**, as the parties are briefing summary judgment, discovery ends on July 20, 2020, and numerous depositions are scheduled over the next few weeks.

[2] **Request for Hearing**: Pursuant to L.R 7.1(b), Plaintiffs respectfully request **a one-hour hearing** to aid in the expeditious resolution of this motion, because parties are currently briefing summary judgment, discovery ends on July 20, 2020, and numerous depositions are scheduled over the next few weeks. A hearing would allow counsel to expound upon the matters presented and answer any questions Your Honor may have about his complex case.

1

During a November 2016 board meeting, on the eve of the peak Holiday shopping season, Defendants conspired to maintain their illegal monopoly power. Defendants then threatened that if OJC continued to sell NH's less expensive play kitchens, KidKraft would stop dealing with OJC. When OJC refused KidKraft's demands, Defendants severed all ties with OJC and ceased fulfilling its customers' orders. Defendants also threatened other retailers, like Costco, that if they sold NH's less expensive play kitchens, they too would be cutoff.

## I. Defendants' ongoing obstructionism is severely prejudicing Plaintiffs' ability to respond to summary judgment, complete discovery, and prepare this case for trial.

Defendants have stopped at nothing to stonewall Plaintiffs' discovery efforts, unleashing virtually every obstructionist tactic in the defense playbook. This includes sandbagging Plaintiffs on May 18 with 1,277 new documents—which constitutes 22% of Defendants' total production—*ten days before* Defendants moved for summary judgment on May 28, and *forty-two days after* representing to this Court on April 16 that Defendants' productions were "complete," (ECF No. 123 at 1), in an effort to defeat Plaintiffs' motion to extend discovery. Despite Defendants' claims that Plaintiffs were making "baseless, petty complaints" and "outright misrepresentations" in an attempt to "force Defendants to re-start document productions *that are complete after many months of work*," *id.* at 4, 10, this Court extended discovery until July 20 (ECF No. 125). On May 13 and again May 18, Defendants advised they would be producing a "handful of trailing materials." Ex. A & Ex. B.

Then, later on May 18, *forty-two days after* representing to this Court that their productions were supposedly "complete," and *ten days before* moving for summary judgment, Defendants produced *1,277 new documents*. This was Defendants' largest single-day production, and which constitutes 22% of their total 5,918 documents (an absurdly low number for a complex antitrust case).[3] Compounding the prejudice, at least four of the new documents were cited in support of Defendants' summary judgment motion. *See Claussen v. Aetna Cas. & Sur. Co.*, 676 F. Supp. 1571, 1582 (S.D. Ga. 1987) (the "sandbagging' of one's opponents through the untimely production of evidence should not be countenanced"), *rev'd on other grounds*, 888 F.2d 747 (11th Cir. 1989). Unfortunately, this sandbagging was simply

---

[3] In contrast, Plaintiffs have produced >50,000 documents responsive to the search terms. While Defendants claim this was a "document dump," anyone who has ever used Westlaw knows the value of a robust database in which targeted searches for documents can be run.

the latest installment of Defendants' obstructionist tactics, including but not limited to:

A. misleading Plaintiffs into believing they had a *complete* "organizational chart" identifying all Defendants' employees from the relevant time for purposes of selecting document custodians, only for Plaintiffs to later discover that Defendants' allegedly "complete" chart omitted numerous potential employee-witness, including at least twenty senior executives, as shown by Defendants subsequent production of *forty-seven* more organizational charts.

B. delaying the onset of their document productions until January 2020—even though Plaintiffs first served document requests in May 2019—and then trickling out documents at a snail's pace. *See* (ECF No. 124 at 5).

C. concealing the vast majority of their documents from Plaintiffs by improperly designating 78% of their productions as "Highly Confidential"—only to later de-designate 29,829 pages when compelled by this Court. (ECF No. 119 at 3).

D. refusing to produce all documents responsive to Plaintiffs' Third RFPs, despite waiving any objections by failing to respond whatsoever, Ex. D.; and

D. asserting textbook evasive responses to requests for admissions, Comp. Ex. C;

F. failing to produce *crucial documents* responsive to Plaintiffs' requests and—instead of fulfilling their obligation to fix their deficient productions—shifting their burden to Plaintiffs to identify each issue, one-by-one, on a piecemeal basis, while running out the clock on discovery. As but a few examples:

(1) In a lengthy nine-email chain beginning in February 2017, KidKraft discussed "zero[ing] out the inventory for . . . Uptown Espresso Kitchen" for another retailer, Target, because it had been selling KidKraft's wooden play kitchen below $140. Ex. E. Although Defendants have produced several copies of the nine-email chain, they have not separately produced the *original* emails in the chain, or any additional chains branching off therefrom, despite being responsive to Plaintiffs' requests. Further, while Target eventually capitulated to KidKraft's demands, agreed "not [to] sell below $140," and "asked that [KidKraft] turn the Uptown Espresso back on," *id.* at 8781, Defendants have withheld all further related emails with Target.

(2) In November 2017, KidKraft emailed its Sales Team about its "plan to do another competitor sample review of . . . play kitchens . . . to provide some valuable information," just like "last year['s] . . . competitor sample review . . . with some really great in depth information[,]" asking the team to "complete the attached and return to our team." Ex. F. Yet KidKraft has not produced any *completed* forms from any year—only the *blank forms* its employees were asked to complete, *see id.*—even though KidKraft's pretextual reason for terminating OJC as a retailer is that "OJC, through its co-owned supplier NH, was [allegedly] knocking off KidKraft's top-selling toy kitchen." (ECF No. 130 at 8).

3

(3) In November 2016, KidKraft sought to hunt down the factories in China that were producing NH's less-expensive play kitchen. Ex. G. Although the last email states "[w]e will continue to try and track down who is doing it," *id.*, Defendants have produced no further emails in response.

(4) In July 2016, an email was sent to KidKraft's "Executives" regarding "brand attitudes, consumer segmentation, purchase triggers and brand differentiation opportunities within [their] 3 core categories (Train / Dollhouse / Kitchen." Ex. H. No responses have been produced.

(5) In December 2016, nine employees received an email about how OJC's "business was turned off" and assigned them various tasks. Ex. I. But only one email response was produced, and none from the employee assigned the discussion regarding "turn[ing] off" OJC. *Id.* at 2449.

## II. Defendants have only produced 6% of the ~100,000 documents responsive to the agreed-upon search terms, based upon their unilateral "relevancy" determinations.

The most egregious obstructionism by Defendants has been their failure to produce all the documents responsive to Plaintiffs' comprehensive requests. In most instances where Plaintiffs have identified serious issues with Defendants' productions, Defendants retort that they have reviewed >100,000 documents responsive to the agreed-upon search terms and produced the 5,918 documents they unilaterally deemed "relevant." *See, e.g.* Ex. K at 5. While Defendants have repeatedly invited counsel to accept this representation at face value, there are compelling reasons why their invitation should be resoundingly rejected.

Aside from Defendants' credibility-shredding tactics outlined above, there are other compelling reasons to seriously doubt the integrity of Defendants' document productions. First, "[r]esearch shows that human review is far from perfect." *Dynamo Holdings Ltd. P'ship v. Comm'r of Internal Revenue*, 2016 WL 4204067, at *5 (T.C. July 13, 2016). The "primary culprit" is "[h]uman error in applying the criteria for inclusion, not a lack of clarity in the document's meaning or ambiguity in how the scope of the production demand should be interpreted . . . . [P]eople make mistakes, and, according to the evidence, they make them regularly when it comes to judging relevance and responsiveness." *Id.*

Second, there is indisputable evidence that Defendants' review team completely missed the mark in applying the stringent criteria in the Court's Protective Order's for designating a document as "Highly Confidential" (aka Attorneys Eyes Only)—namely, Magistrate Judge Hunt's Order finding that Defendants' designation of 78% of their production as Highly Confidential was "high" and compelling Defendants to "de-designate

4

documents that should not be listed as highly confidential," (ECF No. 119 at 3)—resulting in their de-designation of 29,829 pages of their production. Considering how deficient Defendants' review team were in applying the *stringent* criteria for designating a document as Highly Confidential—which "should only be used on a relatively small and select number of documents where a genuine threat of competitive or other injury dictates such extreme measures," *McDonald Apiary, LLC v. Starrh Bees, Inc.*, 2016 WL 868185, at *1 (D. Neb. Mar. 4, 2016)—it's only logical to conclude that they likely completely missed the mark in applying the *liberal* criteria for determining which of the >100,000 documents were responsive to Plaintiffs' requests. *See Hickman v. Taylor,* 329 U.S. 495, 506 (1947) ("discovery provisions are to be applied as broadly and liberally as possible").

This conclusion is bolstered by Defendants' eleventh-hour production of 1,277 new documents (i.e. 22% of their total production) a mere *ten days before* moving for summary judgment, and *forty-two days after* representing to this Court that their document production was "complete." (ECF No. 123 at 1). When Plaintiffs sought to resolve such issues, Defendants repeatedly directed Plaintiffs to identify each specific document that was missing, one-by-one, on a rolling basis—all while running out the clock on discovery. For example, during recent communications about numerous gaps in Defendants' highly relevant financial documents, Defendants stonewalled Plaintiffs by stating: "It is not surprising that there are fewer responsive documents from four to five years before the complaint was filed, before the company went through an acquisition, and *before a number of custodians were even employed by KidKraft*." Ex. J. In other words, Defendants blame Plaintiffs for selecting the wrong custodians. This "gotcha" is particularly troubling, given the very purpose of the parties' original agreement to exchange complete employee lists at the outset of discovery (which Defendants failed to do, *supra* §A) was to promote transparency in selecting custodians and avoid such gamesmanship. *See Hickman,* 329 U.S. at 501 (discovery "serve[s] (1) as a device . . . to narrow and clarify the basic issues between the parties, and (2) as a device for ascertaining the facts, or information as to the existence or whereabouts of facts, relative to those issues," so "trials . . . no longer need be carried on in the dark").

**Requested Remedy**: In light of Defendants' discovery shenanigans, there is no plausible basis for Plaintiffs (or this Court) to have a shred of confidence in the integrity of Defendants' document productions. Plaintiffs thus respectfully request an order that:

(A) Defendants produce by a date certain the remaining 94% of the non-privileged documents responsive to the agreed-upon search terms; (B) Defendants preliminarily designate those non-privileged documents as "Highly Confidential" for Plaintiffs' counsel's review only; and (C) Plaintiffs' counsel shall notify Defendants' counsel before using any of those documents in this case, to allow Defendants an opportunity to determine the appropriate confidentiality designation, if any, at that time. At the end of the day, if the documents are truly "irrelevant," there should be no harm to Defendants in producing them. *See In re Ford Motor Co.*, 345 F.3d 1315, 1317 (11th Cir. 2003) ("some kind of direct access might be permissible" where there is "a factual finding of some non-compliance with discovery rules"); *Simon Prop. Group L.P. v. Simon, Inc..,* 194 F.R.D. 639, 641 (S.D. Ind. 2000) (allowing plaintiff to inspect defendant's computer system because there were "troubling discrepancies with respect to defendant's document production"); *Ameriwood Indus. Inc. v. Liberman,* 2006 WL 3825291, *1 (E.D. Mo. Dec.27, 2006) (granting motion to compel imaging of defendant's hard drive because the court had "cause to question whether defendants have produced all responsive documents").

WHEREFORE, Plaintiffs respectfully request that the Court grant this motion, order the relief requested herein or any other sanctions, award attorneys' fees, and for any other relief that justice requires. A proposed order is attached hereto as Exhibit L.

**Local Rule 7.1 Certification**: Plaintiffs' counsel has conferred with Defendants' counsel in a good faith effort to resolve the issues raised in this motion by email and multiple telephone calls in early June 2020 but has been unable to do so.

                                                   Respectfully submitted,

By: /s/ *Mark A. Schweikert*
Velvel (Devin) Freedman
Florida Bar No. 99762
Constantine Economides
Florida Bar No. 118177
**ROCHE CYRULNIK FREEDMAN LLP**
200 South Biscayne Boulevard, Suite 5500
Miami, Florida 33131
vel@rochefreedman.com

Shlomo Y. Hecht, P.A.
Florida Bar No.: 127144
11651 Interchange Cir S
Miramar, FL 33025
Phone: 954-861-0025

        Fax: 615-413-6404
        Email: sam@hechtlawpa.com

        Mark A. Schweikert
        Florida Bar No. 70555
        **SCHWEIKERT LAW PLLC**
        1111 Biscayne Boulevard, Suite 1550
        Miami, Florida 33131
        (305) 926-9452
        mark@schweikertlaw.com

        *Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 10, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

        */s/ Velvel (Devin) Freedman*
        VELVEL (DEVIN) FREEDMAN