**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 0:19-cv-60341-MGC**

OJ COMMERCE LLC; and
NAOMI HOME, INC.,

       *Plaintiffs*

v.

KIDKRAFT, LP; and
MID-OCEAN PARTNERS, LP

    *Defendants.*

## PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1

# TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................3

II.  LEGAL STANDARD .........................................................................4

III.  ARGUMENT ......................................................................................6

   A.  THIS COURT SHOULD DENY DEFENDANTS MOTION UNDER FRCP 56(D) .................. 6

      *a.   Despite representing that their productions were "complete," Defendants produced 1,277 documents ten days before moving for summary judgment* ........................................................ 6

      *b.   Plaintiffs need time to analyze the new documents, depose Defendants' expert and fact witnesses, and resolve the pending motion to compel* ................................................................ 7

   B.  KK POSSESSES MONOPOLY POWER IN THE RELEVANT MARKET.................................. 8

   C.  DEFENDANTS HAVE WILLFULLY AND IMPROPERLY MAINTAINED KK'S MONOPOLY POWER BY REFUSING TO DEAL WITH OJC AND EXCLUDING NH FROM DISTRIBUTION CHANNELS .............................................................................................. 10

      *a.   Defendants' refusal to deal with OJC constitutes unlawful monopoly maintenance under Aspen Skiing and its progeny*.................................................................................... 11

      *b.   KK's foreclosure of distribution channels for NH constitutes unlawful monopoly maintenance under section 2* .............................................................................................. 15

   D.  DEFENDANTS CONDUCT HARMED COMPETITION.................................................... 19

   E.  THE "SEPARATE ENTITY" DOCTRINE DOES NOT BAR PLAINTIFFS' SECTION 1 CLAIMS 20

   F.  THE "SIGNIFICANT FINANCIAL INTEREST" PRIVILEGE DOES NOT BAR PLAINTIFFS' TORTIOUS INTERFERENCE CLAIMS ................................................................. 21

IV.  CONCLUSION .................................................................................. 22

OJ Commerce LLC ("OJC") and Naomi Home, Inc. ("NH") submit this memorandum in opposition to KidKraft, LP ("KK") and Mid-Ocean Partners IV, L.P.'s ("MOP") Motion for Summary Judgment [ECF No. 130] ("Motion").

## I. INTRODUCTION

In an effort to have this Court enter summary judgment in a complex antitrust case, something the Supreme Court has warned courts not to do when motive is at issue, Defendants' motion ignores clear evidence of their liability and distorts controlling authority.

In fact, while discovery hasn't been completed, there is *already* ample evidence showing KK is a monopolist that had greater then 71% of the market for wooden play kitchens ("WPK") when it undertook the unlawful action described in the complaint and wrongfully used its monopoly power by refusing to deal with OJC and foreclosing distribution channels for NH. *See* Plaintiff's Statement of Material Facts Opposition ("SOFO").

It's undisputed KK terminated a longstanding profitable relationship with OJC because OJC was selling a competing WPK from NH. The parties only dispute *why* that termination occurred. Plaintiffs have substantial evidence showing KK's refusal to deal was motivated by an anticompetitive desire to quash competition. KK argues it terminated OJC because NH's WPK was a "knock-off" of KK's. This is an argument for the jury, but a picture is worth a thousand words. A photo Defendants produced shows the two kitchens:



As the photo shows, the NH WPK is not a "knock-off" of KK's WPK. The designs are totally different. Being a kitchen made of wood does not make OJC's model a "knock off." And while KK cited documents to "prove" they terminated OJC because it "knocked-off" KK's products, KK's admissions demonstrate it uses the word "knock off" in place of "competing." Further, KK regularly reviews competitors' products for their own designs.

3

Defendants claim that there "is not a shred of evidence that KK took any action at any time to foreclose NH's access to any potential retailer." Mot. at 9. That's false. Plaintiffs have KK emails and their owner's testimony that show KK ordered OJC to stop selling NH kitchens or face termination, and that when OJC didn't obey, KK terminated OJC. Plaintiffs' owner has also testified that Costco told him they wouldn't carry NH's kitchen because they couldn't jeopardize their relationship with KK. Finally, Plaintiffs have the declaration of Michael Drobnis, who has been an independent sales representative for 25 years. *Drobnis Decl*. ¶1-7.[1] In 2016, NH hired Mr. Drobnis to help NH place its wooden play kitchens in retail locations. Mr. Drobnis testified that NH's kitchens were "priced well" and were an "attractive product" that he "was confident [he] would be able to place" with retailers. To that end, he reached out to "numerous" retailers including "Costco, BJ's, and Sam's Club." Yet "[t]o his surprise, every retailer [he] contacted declined" and he was "unable to place Naomi Home's wooden play kitchens at any retailer." Mr. Drobnis further declared that after his conversations with these retailers, he "received the impression that they did not want to carry a product that would directly compete with KK and thereby upset the applecart." Despite working in this industry for 25 years, Mr. Drobnis testified that the "type of response [he] received from every retailer [wa]s highly unusual." Thus, contrary to Defendants' claim, Plaintiffs have much evidence NH was excluded from numerous retailers.

At the end of the day, in this factually complex antitrust case, a jury is entitled to reject Kikdraft's pretextual arguments and conclude it unlawfully terminated OJC to maintain its monopoly power and unlawfully excluded NH from distribution channels, both in violation of the Sherman Act.

## II. LEGAL STANDARD

In deciding a summary judgment motion, courts "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (weighing evidence and making credibility determinations for the jury). Summary judgment may be granted only if the record shows "there is no genuine issue as to

---

[1] This motion cites three declarations/reports that are attached to the SOF. The Drobnis Declaration (SOFO. Ex. 18), Vanderhart report (Ex. 3), and Weiss Declaration (Ex. 1). Mark Schweikert, Esq.'s Declaration is attached to this motion as Exhibit 1.

any material fact and that the moving party is entitled to a judgment as a matter of law." *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1299 (11th Cir. 2018). An issue is "genuine" if a jury "could rationally find in favor of the nonmoving party." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).

Importantly, "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles." *Poller v. Columbia Broad. Sys., Inc.*, 386 U.S. 464, 491 (1962); *Omni Healthcare Inc. v. Health First, Inc.*, 2016 WL 4272164, at *27 (M.D. Fla. Aug. 13, 2016).

The Sherman Act provides a civil remedy for damages caused by someone who "shall monopolize, or attempt to monopolize" any trade or commerce. 15 U.S.C. §§ 2, 15.[2] Section 2 makes it "unlawful for a monopolist to maintain or extend its monopoly power by intentionally engaging in conduct that unnecessarily excludes competitors and impairs competition." *Morris*, 364 F.3d at 1294. This cause of action has only two elements: (1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *McWane, Inc. v. FTC*, 783 F.3d 814, 828 (11th Cir. 2015); *McArthur Dairy, LLC v. McCowtree Bros. Dairy*, 2011 WL 2118701 (S.D. Fla. May 27, 2011), at *5 (Cooke, J.).

"[M]onopoly power [is] the power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). "[E]xistence of such power ordinarily may be inferred from the predominant share of the market." *Id.* "[I]t is unlawful for a monopolist to maintain or extend its monopoly power by intentionally engaging in conduct that unnecessarily excludes competitors and impairs competition." *Morris*, 364 F.3d 1288 at 1294.

Under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), a monopolist violates Section 2 by refusing to deal with a rival if it engages in "[t]he unilateral termination of a voluntary . . . course of dealing . . . to achieve an anticompetitive end." *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.,* 797 F.3d 1248, 1266 (11th Cir. 2015) *citing*

---

[2] Count I and II make monopolization and attempted monopolization claims respectively. The "elements of the two offenses differ in only one material respect: attempt to monopolize requires specific intent to achieve monopoly power." *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1293 (11th Cir. 2004).

*Trinko,* 540 U.S. at 407 (2004) and *Aspen Skiing,* 472 U.S. at 585Furthermore, a monopolist violates Section 2 by excluding its competitors from the most efficient distribution channels—*i.e.,* the ones necessary to become effective competitors. *Insight Equity A.P. X, LP v. Transitions Optical, Inc,* 2016 WL 3610155, at *7-9 (D. Del. July 1, 2016) (summary judgment denied because, even though defendant claimed its exclusive contracts foreclosed just 12% of distributors, there was evidence these were the "most efficient channels of distribution," and thus "a reasonable jury could conclude" that defendant's "exclusive arrangements were sufficiently anticompetitive to outweigh TOI's proffered business justification").

## III. ARGUMENT

### A. This Court should deny Defendants motion under FRCP 56(d)

Under Rule 56(d), "[i]f a nonmovant shows by . . . declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." As the Eleventh Circuit has explained in *Snook v. Trust Co. of Ga. Bank of Savannah, N.A.*, 859 F.2d 865, 870 (11th Cir.1988):

> The party opposing a motion for summary judgment has a right to challenge the affidavits and other factual materials submitted in support of the motion by conducting sufficient discovery so as to enable him to determine whether he can furnish opposing affidavits. If the documents or other discovery sought would be relevant to the issues presented by the motion for summary judgment, the opposing party should be allowed the opportunity to utilize the discovery process to gain access to the requested materials. Generally summary judgment is inappropriate when the party opposing the motion has been unable to obtain responses to his discovery requests. *Id.*

> a. Despite representing that their productions were "complete," Defendants produced 1,277 documents *ten days before* moving for summary judgment

Defendants sandbagged Plaintiffs with 1,277 new documents just *ten days before* filing their motion, and *forty-two days after* representing to this Court that Defendants' document productions were "complete after many months of work." ECF No. [123] at 4. Indeed, in early April 2020, Defendants repeatedly claimed they had "substantially completed [their] document production," except for "a relatively small number of additional documents." Ex.

1, Schweikert Decl. ¶6(a)-(f).[3] Then, *forty-two days after* representing to this Court that their productions were "complete," and *ten days before* moving for summary judgment—Defendants produced 1,277 new documents. *Id.* ¶6(k). This was Defendants' largest single-day production, and constituted 22% of their total 5,918 documents. *Id.* Adding insult to injury, at least four of the new documents (totaling over 200 pages) were offered in support of Defendants' motion. *Claussen v. Aetna Cas. & Sur. Co.*, 676 F. Supp. 1571, 1582 (S.D. Ga. 1987) (granting additional time for discovery because an "affidavit . . . and other evidence, was produced for the first time in connection with defendant Federal's motion for summary judgment[,]" and the "sandbagging' of one's opponents through the untimely production of evidence should not be countenanced"), *rev'd on other grounds*, 888 F.2d 747 (11th Cir. 1989).

b. <u>Plaintiffs need time to analyze the new documents, depose Defendants' expert and fact witnesses, and resolve the pending motion to compel</u>

Due to this eleventh-hour sandbagging, Plaintiffs have not had adequate time to review the 1,277 new documents, resolve their pending motion to compel, and make informed decisions about which witnesses to depose with which exhibits—all while analyzing and briefing their response to Defendants' motion, its 96-paragraph alleged "undisputed facts," the 59 documentary exhibits thereto, the five fact witness declarations, and their expert's 39-page declaration supported by over 750 exhibits. Ex. 1, Schweikert Decl. ¶7. Nor have Plaintiffs had any meaningful opportunity to depose Defendants' expert or their primary fact witness declarants.[4] *Id.* ¶¶15-16; *see Poller*, 386 U.S. at 491 ("[t]rial by affidavit is no substitute for trial by jury."). Lastly, Plaintiffs' expedited motion to compel also seeks substantially more documents Defendants have refused to produce. ECF No. [139]. Plaintiffs request this Court deny Defendants' motion and allow Plaintiffs "the opportunity to examine all of the documents they had requested or depose the [witnesses] whose affidavits were offered in support of the motion for summary judgment." *Jones v. City of Columbus*, 120 F.3d 248, 253 (11th Cir. 1997) ("court abused its discretion in deciding the summary judgment motion" when it had not allowed plaintiffs "to gain the information they needed through the normal

---

[3] "[T]he Eleventh Circuit has held that the filing of an affidavit is not required to invoke the protection of the rule." *Northfield Ins. Co. v. Ayyad Bros. Enterprises, LLC*, 2020 WL 1308195, at *3 (M.D. Fla. Mar. 19, 2020).
[4] Three depositions are set for later in June 2020, and Plaintiffs are coordinating the remaining depositions. Ex. 1, Schweikert Decl. ¶16.

discovery process"); *see also Burns v. Gadsden State Cmty. Coll.*, 908 F.2d 1512, 1520 (11th Cir. 1990) (reversing summary judgment because "court should have delayed its decision on the merits" because outstanding discovery "could have a direct bearing on the plaintiff's ability to counter the defendants' motion for summary judgment").

### B.  KK possesses monopoly power in the relevant market

As mentioned above, the two essential elements of a Section 2 cause of action are: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Trinko,* 540 U.S. at 407; *McWane,* 783 F.3d at 828; *McArthur Dairy,* 2011 WL 2118701 at at *5. With respect to market power, the first element of the two-prong test, Defendants do not dispute that the continental United States is the relevant geographic market, and they accept for summary judgment that the relevant product market is wooden play kitchens.[5] They also accept for present purposes that "KK has a market share of 70+ percent."[6] In any event, the evidence shows KK had over a ██% market share on a revenue basis for at least five years in a row. Dr. Vanderhart Report ¶ 12; SOFO. ¶¶ 98-102. KK has monopoly power in this market.

Defendants' own documents prove it. When conducting due diligence to acquire Kikdraft, MOP wrote that KK "████████████████████████████████████" and "████████████████████████████████████████████████████████████████ ████████████████████████████████████████" Vanderhart Report ¶ 37; SOFO. ¶ 110. (emphasis added). Furthermore, and consistent with OJC's story, it was clearly MOP's plan to expand KK's monopoly power on acquisition as they wrote that "████████████████████████ ████████████████████████████████████████████████." Vanderhart Report ¶ 37; SOFO. ¶ 110.

Of course, "[t]he principal measure of actual monopoly power is market share," *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 999 (11th Cir. 1993)), *cert. denied*, 519 U.S. 820 (1996), and KK's greater then ██% share creates a rebuttable presumption or inference of

---

[5] Motion at 17 ("Even if the relevant product market at issue could plausibly be limited to only 'wooden play kitchens' (and it cannot), Plaintiffs have not met their burden to establish that KK possesses sufficient market power to prove its antitrust claims in that market").

[6] *Id.* ("Plaintiffs allege that KK has a market share of 70+ percent. That number is inflated, but regardless, simply pointing to KK's market share is not enough to establish that KK has market power.").

monopoly power. *All Tag Corp. v. Checkpoint Sys., Inc.*, 2018 WL 6514795, at *3 (S.D. Fla. Mar. 27, 2018); see *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (the "existence of [monopoly] power ordinarily may be inferred from the predominant share of the market"); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) ("a market share of over 70 percent is usually 'strong evidence' of monopoly power.").

The presumption of market power is rebuttable, and Defendants may attempt to rebut it at trial, but the presumption alone is "sufficient to avoid a summary judgment or directed verdict." *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 464 (S.D.N.Y. 1996) (evidence showing lack of market power held "insufficient to overcome the inference of market power that the Court is bound to draw, for summary judgment purposes, from its market shares").[7] But even if the presumption *isn't* conclusive (it is), when the Court combines the "strong evidence of monopoly power" that is KK's over ██% market share with the additional evidence Plaintiffs have discovered, the result is conclusive: KK has monopoly power. At a *minimum*, there is at least a fact issue on this point. Defendants cannot really contest this. Monopoly power is the power to control prices or exclude competition. *Grinnell*, 384 U.S. at 571. Dr. Vanderhart's report shows KK has used its monopoly power to do both. Vanderhart Report ¶¶ 61-68; SOFO. ¶¶ 87-89, 108, 115.



Kikdraft controls prices. It forces its resellers to sell for no less than its ████████ ████████ and punishes those who fail to comply with termination. Vanderhart Report ¶ 66; SOFO. ¶ 109. The evidence shows KK wields so much power over price that they brought ████, one of the nation's largest retailers (████████████████████ ████████████████████ ████ ████████████ ████████. Vanderhart Report ¶ 64; SOFO. ¶ 109.

KK also has the power to exclude competition. It has maintained greater than ██% of the market for over ████. Vanderhart Report ¶¶ 12, 42-50. Further, major manufacturers like ████████████ that have dominant positions in plastic play kitchens, well established retail and distribution relationships, and large cash reserves, *have tried* to enter the

---

[7] See also *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483) (summary judgment on market power held improper in light of "evidence that Kodak controls nearly 100% of the parts market and 80% to 95% of the service market); *R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 108 (2d Cir. 1989) (reversing summary judgment because defendant's 84% market share "raises a presumption of illegality and of antitrust injury to competitors of the alleged monopolist").

WPK market but failed to take any meaningful market share from KK. Vanderhart Report ¶¶ 61, 70; SOFO. ¶ 105. In fact, the market trends show that despite these efforts, KK's market share *went up* from 2017 to 2018 from ████████ Dr. Vanderhart ¶¶ 12, 75. Of course, there is also evidence that KK intimidated Costco and other retailers into denying access to its competitors, and that KK successfully coerced OJC to scale back production of its current and new NH kitchen models. Vanderhart Report ¶¶ 61, 65; SOFO. ¶¶ 112-113.

Defendants claim KK lacks monopoly power because there are no barriers to entering the WPK market. But there are significant barriers to entry. As explained by Dr. Jennifer Vanderhart (Plaintiff's expert), barriers to entry include the need for years of time and money "to design and test the products, conduct consumer focus groups, procure manufacturing partners in China, and pass the necessary safety regulations required to sell a toy in the U.S.," plus acquiring relationships needed to "sell to the larger retailers." Vanderhart Report ¶ 72; SOFO. ¶¶ 81-86, 105-106. Shipping cost is another barrier, because shipping carriers provide volume based discounts and a new entrant will seldom have the necessary volume to get discounts that will let them compete. Vanderhart Report ¶ 73; SOFO. ¶106.

In sum, Plaintiffs have demonstrated KK has such a large market share that the law imposes a presumption they are a monopolist. Plaintiffs have then backed that presumption up with KK's own parent company's documents showing KK "████" the WPK market and that they are "███████████████████████████████████." Finally, Plaintiffs have shown there are significant barriers to entry, KK controls price, and has the power to exclude competition. Clearly Plaintiffs have demonstrated a jury may reasonably find KK wields monopoly power.

### C. Defendants have willfully and improperly maintained KK's monopoly power by refusing to deal with OJC and excluding NH from distribution channels

With respect to the second prong of the § 2 test, Defendants do not even attempt to argue KK maintained its monopoly power "as a consequence of a superior product, business acumen, or historic accident" and thus implicitly concede they have achieved it unlawfully through "the willful acquisition or maintenance of that power." *Trinko*, 540 U.S. at 407; *McArthur Dairy,* 2011 WL 2118701 at *5. Plaintiffs' evidence shows Defendants improperly maintained KK's monopoly by conspiring, threatening, and then actually terminating their voluntary, profitable, and longstanding relationship with OJC solely to stifle competition

from NH. Defendants disagree. But if Plaintiffs are right (and they are) this constitutes the paradigmatic refusal to deal case under *Aspen Skiing*. Plaintiffs evidence also shows KK maintained their monopoly power by making sure other distributors would not carry NH's kitchens. Defendants deny this happened. But if the jury disagrees, KK has violated the Sherman Act. The jury is entitled to hear both side's evidence and resolve these factual disputes. The Court should deny summary judgment.

a. Defendants' refusal to deal with OJC constitutes unlawful monopoly maintenance under *Aspen Skiing* and its progeny

A monopolist as a general matter "can refuse to deal with its competitors. But such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992) (citing *Aspen Skiing*). In *Aspen Skiing*, where one ski resort terminated a voluntary, long-term, profitable agreement with a competing resort, the Supreme Court found that the jury properly rejected the defendant's proffered "legitimate" reasons and found a § 2 violation because the defendant improperly "sacrifice[d] short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." 472 U.S. at 610-11.

That is exactly what happened here. As testified by Jacob Weiss (OJC's president), in 2015, KK informed OJC that it must stop selling the NH kitchen or face termination of its relationship with KK. [SOFO. ¶ 112.] An internal KK email produced in discovery corroborates Mr. Weiss' testimony.[8] After making this threat, KK extracted a commitment from OJC not to stock any other NH products beside that the one kitchen. SOFO. ¶ 112. KK knew OJC and NH had a common owner and that this threat would be very effective. SOFO. ¶ 112. In response to this threat, NH decreased production of its kitchen, stopped trying to design additional models, and did not approach any retailers to carry NH kitchens. SOFO. ¶ 112; Vanderhart Report ¶¶ 96-99. This resulted not only in injury to OJC and NH, but also harm to competition in the form of reduced choice and artificially inflated prices. Dr. Vanderhart Report ¶¶ 76-79; SOFO. ¶ 116.]

Over a year later, in November 2016, KK employee Daniel Barr sent OJC's Jacob Weiss a **smoking gun email** admitting that "the topic of the Naomi Kids Brand came up" at

---

[8] After receiving an email that the "████████████" was back in stock at Amazon, KK's Executive Vice President of Sales, Chris Light, reacted by trying to find any pretext to terminate OJC: "████████████████████████████████████████████████████████" SOFO. ¶ 112.

Defendants' board meeting, that KK had noticed a "decline in sales" as a result of the Naomi Home brand competition, and that KK wanted a call with OJC about this issue. SOFO ¶30; Def. SOF Ex. 19. Mr. Weiss testified that on that call, Barr told him OJC had to either stop selling the NH kitchen or lose its KK business completely. SOFO. ¶ 113. Mr. Weiss pleaded for an opportunity to discuss the matter with KK's management, and he was assured he would get one, but two days later KK cut off OJC's account without notice, refusing to ship even products that customers had already paid for in full. SOFO. ¶ 113.

It is undisputed, and the evidence plainly shows, that the OJC-KK course of dealing was profitable, voluntary, and long-term. Vanderhart Report ¶¶ 81-82, 86; SOFO. ¶ 111. OJC was one of KK's ████ sellers. Vanderhart Report ¶¶ 80-85; SOFO. ¶¶ 16, 98, 111. Further, emails from KK demonstrates that ████████████████████████████████ ████████████████████████. Vanderhart Report ¶¶ 85-87. Finally, KK categorically refused to sell any products to OJC, even at prices it sold other retailers. SOFO. ¶ 113. Thus, a jury could easily find Defendants' unilateral termination of this "voluntary (and thus presumably profitable) course of dealing" was based on "a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409 (citing *Aspen Skiing*, 472 U.S. at 610-11).

Although Defendants attempt to cast *Aspen Skiing* as a "rare exception to the general rule," it was reaffirmed in *Trinko* and has been followed many times, most recently by the Seventh Circuit in *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020). In a scholarly opinion, *Viamedia* reversed the dismissal of an anticompetitive refusal to deal claim. After reviewing the Supreme Court's jurisprudence in *Aspen Skiing* and *Trinko*, the Seventh Circuit concluded that a refusal to deal is actionable under § 2 where, as here, there is "a prior course of voluntary conduct, sacrifice of short-term profits, and refusal to sell to rivals on the same terms as other potential buyers." *Id.* at 463.

Contrary to Defendants' position, actionable claims against a monopolist for refusal to deal are far from "rare," they are quite common in the federal courts. Recent cases in addition to *Viamedia* include, e.g., *Omni Healthcare Inc. v. Health First, Inc.*, 2016 WL 4272164, at *27 (M.D. Fla. Aug. 13, 2016) (denying summary judgment under *Aspen Skiing* on a refusal to deal monopolization claim); *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*, 311 F. Supp. 3d 468, 492 (D.R.I. 2018) (under *Aspen Skiing* and *Trinko*, plaintiff's

refusal-to-deal claims for unlawful monopolization "clear the summary-judgment bar"); *Iris Wireless LLC v. Syniverse Techs.*, 49 F. Supp. 3d 1022, 1029 (M.D. Fla. 2014) (upholding refusal to deal claim under *Aspen Skiing*); *Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1082 (C.D. Cal. 2017) (refusing dismissal because "this case plausibly fits within the *Aspen Skiing* exception"); *Pepsico, Inc. v. Coca-Cola Co.*, 1998 WL 547088, at *17–18 (S.D.N.Y. Aug. 27, 1998) (same).

These and other cases, each involving widely varying circumstances and facts, show there is absolutely no merit to Defendants' position that *Aspen Skiing* is limited to that case's "exceptional fact pattern" and to plaintiffs that "require cooperation in order to compete." Quite the contrary, an *Aspen Skiing* claim has just three "key elements...: [1] a prior course of voluntary conduct, [2] sacrifice of short-term profits, and [3] refusal to sell to rivals on the same terms as other potential buyers. ***Certainly, no more is required***." *Viamedia*, 951 F.3d at 463 (emphasis added). See also, e.g., *Steward Health*, 311 F. Supp. 3d at 485 (summary judgment denied even though "the indicators of anticompetitive animus here vary somewhat from what the Supreme Court identified in *Aspen Skiing* and *Trinko*"); *Pepsico*, supra (no allegation that Pepsi required cooperation from Coke in order to compete).

Defendants repeat the same legal argument rejected by this Court in denying their motion to dismiss (ECF No. 49), *i.e.,* that *Aspen Skiing* is inapplicable because OJC is a mere "jilted distributor" that was terminated for "ineffectiveness" and "knocking-off" KK's kitchen. But as already briefed in the motion to dismiss opposition, Defendants are wrong. ECF No. [16], at 18-20. But even if they are right on the law (they aren't) the Court must certainly reject this "motive based" argument now (at the motion for summary judgment stage) because Defendants' motive for terminating OJC is a question of fact, and there is ample evidence that OJC was terminated because KK wanted to stifle competition, not for a legitimate reason. *Poller*, 386 U.S. at 491 (emphasis added) ("summary procedures should be used sparingly in complex antitrust litigation **where motive and intent play leading roles**.").

i.   Defendants' "legitimate business interests" defense is for the jury

Defendants insist they are entitled to summary judgment because they terminated OJC for "legitimate business reasons." But Defendants ignore the strong evidence that their asserted "justifications" for terminating OJC are obvious pretexts. Given this factual dispute over KK's intent/motive, it is for the jury to determine whether their purported reasons are

"legitimate," or just pretextual. *Viamedia*, 951 F.3d at 457 (courts treat justifications for anticompetitive conduct "as a factual issue properly resolved by the jury"); *Omni Healthcare*, 2016 WL 4272164, at \*27 (denying summary judgment because "multiple pieces of evidence" suggested that the "purported business reasons are pretextual"); *Poller*, 386 U.S. at 491 (summary judgment inappropriate for antitrust cases involving "motive and intent.").[9]

Defendants assert OJC was terminated because it was selling a "knock-off" of KK's kitchen and because OJC's sales of KK products were "plummeting." But the evidence shows KK did not terminate OJC for either of these reasons; KK refused to deal with OJC because it was selling the competing NH kitchen. First, the NH kitchen is not a "copy" of KK's kitchen, but a distinctly different design. SOF ¶ 116; Weiss Decl., Ex. A. KK nevertheless calls the NH kitchen a "knock-off" numerous times without the slightest evidence or explanation why that is so. The photo on the first page plainly shows the kitchens are completely different. This alone demonstrates the "knock-off" justification is pretextual. Moreover, Plaintiffs' evidence shows NH spent considerable time and expense developing the NH Kitchen, including extensive documentation, many versions of design drawings, and focus group research, all of which shows NH wasn't copying KK's kitchen. SOFO. ¶ 116.

Defendants cite some internal KK documents to try and demonstrate that KK terminated OJC because it believed OJC was "knocking off" KK's kitchens. But the evidence also shows KK used the word "knock off" as synonymous for "competing," and it's for this reason KK admitted that the vast majority of their competitors "knock off" their kitchens. SOFO. ¶ 27. Furthermore, KK can hardly assert that analyzing a competitor's product to ensure your own products can compete is a 'bad practice' that merits termination when KK's own documents demonstrate that they ███████████████████████████████ ███████████████████████████████████. SOFO. ¶ 125.

As for the "plummeting" sales justification, KK's own documents show that 2015, the last full year of the KK-OJC relationship, was a record year for OJC sales of KK products, with OJC selling ████████ KK products, which exceeded KK's internal budget for OJC by

---

[9] Accord, e.g., *Eastman Kodak*, 504 U.S. at 483 ("Factual questions exist, however, about the validity and sufficiency of each claimed justification, making summary judgment inappropriate"); *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) ("Whether valid business reasons motivated a monopolist's conduct is a question of fact"); *Feminist Women's Health Ctr., Inc. v. Mohammad*, 586 F.2d 530, 547 (5th Cir. 1978) ("triable fact issues remain as to the genuineness of the defendants' justification").

more than ▮▮▮. Vanderhart Report ¶ 80 and Ex. C; SOFO. ¶¶ 30, 111. KK terminated OJC in November 2016. It's true that OJC's sales were down for the portion of 2016 prior to termination, but OJC was terminated prior to the 2016 Thanksgiving-Christmas holiday season, which accounts for a large part of OJC's sales. SOFO. ¶ 113. Moreover, the 2016 decline was also attributable to KK's own lack of inventory, ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮5.

Vanderhart Report ¶ 80 and Ex. F; SOFO. ¶¶ 17, 111; Defs. Ex. 30 ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Numerous other vendors sold far less than OJC but were not terminated. Vanderhart Report ¶ 84; SOFO. ¶ 114. In fact, the loss of OJC was specifically noted ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮. *Id.* ¶¶ 111. KK never mentioned the decline in sales, or any other reason besides OJC's selling of the NH kitchen, in any of the many conversations between the parties. *Id.* ¶29.

On this record, a jury can (and easily will) find that Defendants' terminated OJC because OJC was competing with KK and that KK's proffered "legitimate" justifications are a disingenuous pretext. Consequently, summary judgment should be denied. *Poller*, 386 U.S. at 491 (emphasis added) ("summary procedures should be used sparingly in complex antitrust litigation **where motive and intent play leading roles**.").

> b. <u>KK's foreclosure of distribution channels for NH constitutes unlawful monopoly maintenance under section 2</u>

The legal principles set forth above regarding KK's market power, improper use of that power to maintain its monopoly, and harm to competition are equally applicable to NH's § 2 claim. Defendants primary argument is simply factual, *i.e.*, that they never threatened any other vendors for selling NH products. Whether they did is a question of fact for the jury, not for summary judgment. Defendants' secondary argument, that NH has not shown a "substantial foreclosure" of the market to NH, also lacks merit.

Contrary to Defendants' contention, there *is* evidence that KK threatened other vendors. Jacob Weiss testified that a Costco toy buyer told him Costco could not do business with NH because they could not jeopardize their relationship with KK. [SOFO. ¶ 114.] and

the jury is entitled to believe him.[10] Even the "self-serving and/or uncorroborated" testimony of a single witness is sufficient to defeat summary judgment. *United States v. Stein*, 881 F.3d 853, 857–59 (11th Cir. 2018) (*en banc*). But he is not a single witness. Despite that discovery is *ongoing*, Plaintiffs have already collected evidence and testimony that corroborates Mr. Weiss' testimony and Plaintiffs' allegation that KK threatened to punish vendors if they dealt with NH. As it turns out, KK is Costco's ███████████████ and Costco became ████ ████████ when KK failed to respond to Costco's pricing inquiries, so much so that Costco started ████████████████████████████ [report ¶ 64; SOFO. ¶ 115.] This shows how sensitive Costco was to KK's wishes and may explain why Costco is reluctant to confirm what it said to Mr. Weiss.[11]

In addition, this conduct would be par for the course with KK, who does not hesitate throwing its weight around to bully retailers into complying with its demands. For example, as discussed above, KK simply cut ████ off when they failed to honor KK's pricing directives. [¶63; SOFO. ¶ 109]. Finally, there is the fact that KK threatened to terminate OJC, and ultimately did terminate OJC, for carrying the NH kitchen. [SOFO. ¶¶ 112-13.] The threat to one vendor allows an inference that other vendors were similarly threatened.

Finally, Plaintiffs obtained the declaration of Michael Drobnis, who has been an independent sales representative placing products in retail locations for over 25 years. Drobnis Decl. ¶2. As explained above, NH hired Drobnis to help sell its wooden play kitchens to retailers. *Id.* ¶3. Drobnis testified NH's kitchens were "priced well," were an "attractive product," and that he "was confident [he] would be able to place" with retailers. *Id.* ¶4. To that end, he reached out to "numerous" retailers including "Costco, BJ's, and Sam's Club." Id. ¶3. Yet "[t]o his surprise, every retailer [he] contacted declined" and he was "unable to place Naomi Home's wooden play kitchens at any retailer." Id. ¶5-7. Mr. Drobnis further declared that after his conversations with these retailers, he "received the impression that they did not want to carry a product that would directly compete with KK and thereby upset the

---

[10] While Mr. Weiss was given a phone number and the name Shannon Lord, it seems he likely spoke to Trisha Triplett. SOFO. ¶ 117. Mixing up the name of a representative you spoke with over the phone does not render the testimony so incredible that a jury could not believe it. Mr. Weiss stands by his testimony. SOFO. ¶ 117. Summary judgment is not the place to judge credibility.

[11] It is true, as Defendants state, that ████████████████████████████████████████ ████████████ ███████   SOFO. ¶ 115.
Id. ¶80.

applecart." Id. ¶5. Despite working in this industry for 25 years, Mr. Drobnis testified that the "type of response [he] received from every retailer [wa]s highly unusual." Id. ¶6.

In light of Mr. Weiss' testimony, the corroborating evidence from KK's documents, and Drobnis's declaration there is a clear and genuine factual issue over whether KK unlawfully caused retailers not to deal with NH. At any rate, discovery is continuing, additional evidence of KK's threats may surface, and summary judgment would therefore be inappropriate. Rule 56(d).

   i. Defendants' "substantial foreclosure" argument lacks merit

Defendants' secondary defense to NH's § 2 claim is that KK's threats to punish vendors if they carry NH products would not be unlawful because they didn't "substantial[ly] foreclose" the market to NH. That's incorrect. If "a monopolist refuses to deal with customers who deal with its rivals," such "behavior is inherently anti-competitive [and] illegal, either as monopolization or attempt to monopolize." *Byars v. Bluff City News Co.*, 609 F.2d 843, 858 (6th Cir. 1979).

The Supreme Court has made it clear that monopolists face liability if they refuse to deal with a customer that does business with its rivals. *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951). In *Lorain*, a newspaper refused to accept ads from customers unless they agreed not to place ads with the local radio station, and this was unanimously held to violate § 2: "The publisher claims a right as a private business concern to select its customers and to refuse to accept advertisement from whomever it pleases. We do not dispute that general right [but its] exercise as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act." *Id.* at 155. See also *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973) (monopoly power company violated § 2 by refusing to sell wholesale power to towns that wished to start competing power companies). As the leading antitrust treatise explains:

> Extraction of an agreement not to deal with any competitor—or the equivalent, refusing to deal with buyers who do—can be exclusionary and particularly damaging where the buyers cannot do without the seller's product or service. We see no convincing justification for a requirement that a customer not deal with a particular rival. 3A Areeda & Hovemkamp, Antitrust Law ¶ 768e6.

In support of their "substantial foreclosure" argument, Defendants rely on cases involving "exclusive dealing" contracts. But these contracts "are common and can be

procompetitive," *McWane*, 783 F.3d at 827,[12] and are therefore treated more leniently under antitrust law than a "naked exclusion" that has no purpose other than the exclusion of rivals, which has no arguable benefits to competition– such as KK's threats here. See 3A AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 768a5, at 159 (3d ed. 2006). There is simply no arguable procompetitive purpose to punishing dealers for transacting with a rival.

Even in the exclusive dealing context, however, "substantial foreclosure" is not an essential element of a § 2 claim. Instead, courts are just required to consider it, as "one of several factors [courts] examine in determining whether the conduct harmed competition," in addition to "direct evidence that the challenged conduct has affected price or output, along with other indirect evidence, such as the degree of rivals' exclusion, the duration of the exclusive deals, and the existence of alternative channels of distribution." *McWane*, 783 F.3d at 835. Moreover, "a lesser degree of foreclosure is required when the defendant is a monopolist." *Id*. at 837.

As noted in an article cited with approval by the *McWane* court,

> A large amount of percentage foreclosure, without more, proves nothing, but the absence of percentage foreclosure is equally unilluminating. In all cases, the relevant question is instead whether there has been an adverse effect on price, output, quality, choice, or innovation in the market as a whole. If there has been no adverse effect, the degree of foreclosure will not help the plaintiff prevail. But *if price, output, quality, choice, or innovation have been harmed, the lack of percentage foreclosure is no defense*. Several recent cases have in fact found exclusive dealing and similar arrangements unlawful despite minimal, or even zero, levels of percentage foreclosure from access to the ultimate consumer.

Jacobson, Exclusive Dealing, "Foreclosure," and Consumer Harm, 70 Antitrust L.J. 311, 362–63 (2002) (emphasis added), cited in *McWane*, 783 F.3d at 827.  Thus, in the present case, if the jury finds that KK threatened to refuse to deal with even one customer if that customer dealt with NH (something Plaintiffs already have direct evidence of vis-à-vis OJC, strong evidence through Mr. Drobnis, and strong circumstantial evidence through Costco's comments), and if further the jury finds that Kidcraft's exclusionary conduct harmed competition by causing an increase in price or a reduction of choice or innovation, then Plaintiffs prevail, regardless of the percentage of the market foreclosed to NH by virtue of

---

[12] The *McWane* court analyzed the case as if it involved "exclusive dealing" contracts, even though the facts were more akin to a *Lorain Journal*-type threat to refuse to deal with customers who deal with its rivals.

compliance with KK's threats. Finally, in light of KK's monopoly power, the loss to NH of even one large vendor such as Costco would be a "substantial" foreclosure resulting in harm to competition prohibited by § 2. Defendants' motion for summary judgment should therefore be rejected.

### D. Defendants conduct harmed competition

A defendant harms competition by improperly maintaining monopoly power, and Plaintiffs have ample proof of competitive harm in the form of increased prices and lowered consumer product selection. A monopolist cannot attack a small, new competitor and then avoid § 2 liability by saying, as Defendants do, "one fewer retailer out of a nationwide retail market . . . has no substantial impact on the market." Mot. at 15. Exclusionary conduct by a monopolist "is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy." *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 213 (1959). Improper maintenance of a monopoly *is* harm to competition. And therefore any action by a monopolist "as part of a scheme of willful acquisition or maintenance of monopoly power" violates § 2, unless "valid business reasons" can "explain [the monopolist's] actions." *Eastman Kodak*, 504 U.S. at 482–83.

But Plaintiffs have even more direct evidence of competitive harm. Harm to competition includes, but is not limited to, "reduction of output, increase in price, or deterioration in quality." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010). Moreover, harm to competition in the market may be inferred if the challenged conduct has an "inherent[ly] anticompetitive nature." *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1270 (11th Cir. 2015).[13]

Here, Defendants' efforts to suppress a competitor are inherently anticompetitive, and there is evidence that their actions harmed competition by causing increased prices and reduced product choice and innovation. OJC is an "aggressive discounter" that competes across e-commerce markets (like amazon.com). SOFO. ¶ 120. Part of OJC's business model is that it has implemented algorithms to be the "lowest-priced ecommerce seller." Vanderhart

---

[13] In support of their "harm to competition" argument, Defendants do not cite any § 2 cases and rely solely on cases construing Sherman Act § 1, which prohibits agreements "in restraint of trade." However, § 2 "is broader and less categorical in its definition of proscribed conduct." *Viamedia*, 951 F.3d at 453. Plaintiffs' evidence that Defendants' conduct caused increased prices and reduced product choice and innovation satisfies even the § 1 standard, as well as the more lenient § 2 standard.

Report ¶76. Due to the competition in the e-commerce marketplaces, OJC's aggressive discounting forces the entire market to compete with its lower price. Vanderhart Report ¶ 76; SOFO. ¶ 120. Thus, the termination of OJC caused increased prices to the ultimate consumer. Vanderhart Report ¶¶ 76, 78; SOFO. ¶¶ 87-89, 120. KK did in fact raise ███████████ after terminating OJC and KK's average prices ████████████████████████████████ ███████ Vanderhart Report ¶ 62; SOFO. ¶ 108.

Even before KK terminated OJC in November 2016, KK harmed competition by forcing OJC to agree not to carry any NH products other than the one kitchen (and to carry less of that one kitchen). NH had started developing other play kitchens, as well as a train table and a dollhouse, but it was forced to stop development of new and innovative items in light of KK's demands. SOFO. ¶ 112. This deprived consumers of these items and innovations and lessened competition by not having these additional, innovative products on the market. Vanderhart ¶ 77; SOFO. ¶ 112. The jury is entitled to believe Plaintiffs' evidence, so summary judgment should be denied.

### E. The "separate entity" doctrine does not bar Plaintiffs' Section 1 claims

Defendants repeat a *second* legal argument from their motion to dismiss (ECF No. 15 at 13-14), that this Court already rejected (ECF No. 49). Specifically, that Plaintiffs § 1 claim is barred by the "separate entity" doctrine of *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767 (1984). This contention is baseless. Defendants cite this Court's decision in *McArthur*, 2011 WL 2118701, but completely ignore the test *McArthur* sets forth: unless the subsidiary is "wholly owned" by the parent, "separateness" is measured by inquiring "whether the subsidiary has separate control of its day-to-day operations, separate officers, separate corporate headquarters, and so forth." *Id.* at *3.

It is undisputed KK is not a "wholly owned" subsidiary of MOP. Motion at 19 ("█ ████████████████████████████████████████████"; Defs SOF ¶ 3). Furthermore, all of the "separateness" criteria identified in *Copperweld* and *McArthur Dairy* show that KK and MOP are in fact separate entities: (i) "██████████████████████████████ ███████████████████████" (SOFO. ¶ 121); (ii) ████████████████████████ (SOFO. 124); (iii) ████████████████████████████████ (██████████████ ███████████ (SOFO. ¶ 124). In light of these facts, it is clear that KK and MOP are "independent centers of decisionmaking" that are "capable of conspiring under § 1." *Am.*

*Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 196 (2010) (quoting *Copperweld*, 467 U.S. at 769).[14] At the very least, this is a genuine issue of material fact for the jury.

### F. The "significant financial interest" privilege does not bar Plaintiffs' tortious interference claims

Defendants repeat a *third* legal argument from their motion to dismiss (ECF No. 15 at 13-14), that this Court has already rejected (ECF No. 49). Specifically, that the "significant financial interest" privilege precludes Plaintiffs' claim for tortious interference with a business relationship, because MOP is not a "stranger" to the KK-OJC relationship. Nothing has changed and this Court should reject it again.

A tortious interference claim requires proof of 1) a business relationship between the plaintiff and a third person, 2) the defendant's knowledge of the relationship, 3) an intentional and unjustified interference with the relationship by the defendant which induces or otherwise causes the third person not to perform, and 4) damages. *DN Sports Performance Lab, Inc. v. Club Atlantis Condo. Ass'n, Inc.*, 219 So. 2d 107, 110 (Fla. 3d DCA 2017). Defendants do not dispute Plaintiffs have sufficient evidence of each of these elements. Instead, Defendants rely solely on the "significant financial interest" privilege, based on MOP's status as "the majority and controlling owner of KK." But Defendants completely ignore the case law cited in Plaintiffs' successful opposition to their motion to dismiss, which plainly shows that this is just a *qualified* privilege that does not apply where, as here, the interfering person acts "improperly" or in "bad faith":

> The so-called "privilege to interfere" protects certain parties with a legally-recognized interest in a contract from being sued for interfering with that contract. The privilege is not unlimited, however, and it does not afford an absolute shield to liability. Thus, even for "non-strangers" to a contract, the privilege to interfere is a valid defense only to the extent the interference was done in good faith. In other words, parties are disqualified from asserting the privilege if they act *maliciously or with conspiratorial motives*.

*Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1312, 1320 (S.D. Fla. 2014) (emphasis in original) (quoting *CSDS Aircraft Sales & Leasing, Inc. v. Lloyd Aereo Boliviano Airlines*, 2011 WL 1559823, at *5 (S.D.Fla. April 22, 2011)). "Florida courts have recognized that the privilege

---

[14] See also, e.g., *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 884–87 (N.D. Ill. 2010) (majority shareholders capable of conspiring with subsidiary); *Aspen Title & Escrow, Inc. v. Jeld-Wen, Inc.*, 677 F. Supp. 1477, 1486 (D. Or. 1987) ("only corporations which are owned 100% in common, or a de minimis amount less than 100%, are covered by the *Copperweld* rule.").

to interfere is a valid defense to a claim for tortious interference only where the interference was not done for some improper purpose[, and the right to interfere] is qualified by the obligation to proceed in good faith." *Burger King Corp. v. Ashland Equities, Inc.*, 161 F. Supp. 2d 1331, 1336 (S.D. Fla. 2001). Accord, *Morsani v. Major League Baseball*, 663 So. 2d 653, 657 (Fla. 2nd DCA 1995) (no privilege for "threats, intimidation and conspiratorial conduct"); *Making Ends Meet, Inc. v. Cusick*, 719 So. 2d 926, 928 (Fla. 3d DCA 1998) (the "qualified privilege" to interfere "carries with it the obligation to employ means that are not improper"); RESTATEMENT (SECOND) OF TORTS § 769 cmt. d (1979) ("Also wrongful is the use of unlawful means such as an illegal boycott or conduct in restraint of competition or productive of an illegal monopoly.").

At the motion to dismiss, the Court specifically rejected Defendants argument on this issue. 2019.11.18 Hrg. Trns at 30:15-20. ("I think the plaintiff was quite honest. His tortious interference claim was going to rise and fall on the antitrust claim. If he doesn't make out an antitrust claim and can't show actual malice, it falls. So the defendant's motion to dismiss plaintiff's complaint is denied.")

Plaintiffs have already admitted that their ability to prevail on this claim will "rise and fall" with their ability to prove an antirust wrong. Id. at 25:9-11. Plaintiffs' evidence shows MOP induced KK to terminate its business relationship with OJC in violation of the antitrust laws. SOFO. ¶¶ 30, 110; Defs. Ex. 19 ("As you are probably aware KK was purchased by the private equity group MOP Partners earlier this year. In a board meeting recently the topic of the Naomi Kids Brand came up and this is something I would like to talk with you about."); Weiss Decl. If Plaintiff can demonstrate that, then Defendants conduct is malicious, in bad faith, and with improper anticompetitive intent. The issue of MOP's bad faith and improper intent is for the jury, so summary judgment should be denied.

## IV. CONCLUSION

For the forgoing reasons, Plaintiffs respectfully submit that Defendants' motion for summary judgment should be denied in its entirety.

Dated:  June 8, 2020                    Respectfully submitted,

                                        *s/ Velvel (Devin) Freedman*
                                        Velvel (Devin) Freedman, Esq.
                                        Fla. Bar No. 99762
                                        Constantine Economides, Esq.
                                        Fla. Bar No. 118177
                                        William Dzurilla, Esq.
                                        Fla. Bar No. 757861
                                        **ROCHE CYRULNIK FREEDMAN LLP**
                                        200 S. Biscayne Blvd.
                                        Suite 5500 Miami, Florida 33131
                                        vel@rcfllp.com
                                        ceconomides@rcfllp.com
                                        nbermond@rcfllp.com

                                        Mark A. Schweikert
                                        Florida Bar No. 70555
                                        **SCHWEIKERT LAW PLLC**
                                        1111 Biscayne Blvd., Suite 1550
                                        Miami, Florida 33131
                                        (305) 926-9452
                                        mark@schweikertlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 11, 2020, a true and correct copy of the foregoing was filed with CM/ECF under seal and I emailed a copy to be served on all counsel of record.