UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 19-CV-60341-CIV-COOKE/SNOW

OJ COMMERCE LLC; and
NAOMI HOME, INC.,

       Plaintiffs,

v.

KIDKRAFT, INC.; and
MIDOCEAN PARTNERS IV, L.P.,

       Defendants.

_____/

**DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Plaintiffs' Supplement changes nothing. There is still no *actual evidence* to raise a genuine dispute of material fact. Plaintiffs continue to try to conjure up disputes about immaterial factual issues that, true or not, are legally insufficient to sustain their claims. But there remains no evidence to support essential elements of their claims. Most notably, there is no evidence that KidKraft did anything to foreclose Naomi Home's access to other retailers—indeed, there is no evidence that KidKraft ever said anything to any other retailer about Plaintiffs. This was reaffirmed by the recent discovery. And there is no evidence that KidKraft's termination of OJC as a retailer of KidKraft products—one retailer among hundreds, which sold only ▮(!) KidKraft kitchens over a 6-month stretch in 2016—harmed competition in any way. It is undisputed that OJC continued to sell NH kitchens at all times, and OJC's sales of NH kitchens *skyrocketed* after KidKraft ended its relationship with OJC. There is no *evidence* KidKraft foreclosed NH's ability to compete for the sale of toy kitchens in any way. Defendants' Motion for Summary Judgment should be granted on all claims.

**I.   Plaintiffs Still Offer No Evidence KidKraft Foreclosed NH's Access to the Market.**

To survive Defendants' Motion to Dismiss, Plaintiffs claimed KidKraft prevented them from selling NH's kitchen to Costco and potentially other retailers. MSJ Reply at 5–6. As before, however, there is no evidence that KidKraft ever said anything to Costco or any other retailer about Plaintiffs. Costco's toy buyer, Trisha Triplett, testified that KidKraft never said anything to Costco about Plaintiffs. Supp. Ex. 1 (Triplett 107:24–108:6, 146:16–25). All KidKraft witnesses employed at that time testified they never spoke to any retailer about Plaintiffs. Supp. Exs. 2–4 (Light 7/30 30:15–31:14; Wolfson 341:21–342:8; Barr 273:19–274:20). There is no evidence to the contrary. No documents. No testimony. KidKraft was not even *aware* NH was trying to sell its kitchen to Costco. Supp. Ex. 2 (Light 7/30 29:25–30:3). There is no evidence KidKraft did anything to foreclose NH's access to the market.

Ms. Triplett testified that KidKraft had nothing to do with Costco's decision not to buy NH's kitchen; she was simply not interested in NH's product. *See* Supp. Ex. 1 (Triplett 84:25–85:7, 139:15–140:3). Costco did not fear that KidKraft would retaliate against it for carrying a competitor's product—in fact, Costco chose a competitor's kitchen (from Teamson) in that same buying cycle.[1] *Id.* at 144:17-23.

---

[1] Plaintiffs initially claimed Shannon Lord, an IT analyst who works on Costco's Mexico IT systems, told Jacob

As Ms. Triplett testified, for the 2017 holiday buying season, Costco considered over 1,000 toys over a 6-month period from August 2016–February 2017. *Id.* at 18:21–21:9; 108:11–114:4. Costco had numerous meetings and product demonstrations with potential suppliers, narrowing down to 220 products for its final decision in early February. *Id.* It considered 3 toy kitchens in that process: KidKraft (wooden), Teamson/Kenyield (kitchen/dollhouse combo), and Step2 (plastic). *Id.* at 114:16–116:13. On February 9, 2017, Costco informed KidKraft it would not carry a KidKraft kitchen in its stores. *Id.* at 131:6–133:13; SOF ¶ 52. It instead decided to carry Teamson's product. *Id.*

NH was not evaluated in that process because it did not even reach out to Costco until February 6, 2017, when Costco was finalizing its decision to buy Teamson's product for holiday 2017. *See* Supp. Ex. 5 (Triplett Ex. 9); Supp. Ex. 1 (Triplett 140:19–141:19). This is undisputed. Costco had not even heard of NH prior to receiving that cold-email outreach— also undisputed—but nonetheless meaningfully reviewed the offering. Supp. Ex. 1 (Triplett 135:21–136:4; 141:10–19; 147:19–148:17). On February 16, 2017—a week after Costco told KidKraft that it would not be carrying a KidKraft kitchen in 2017—Costco informed NH that it was "███████████████████████████████████."[2] *Id.* at 139:22–23. Ms. Triplett "███████████████████████████████████████████████████████████████████████████████████████." *Id.* at 148:3-17. She testified that "███████████" KidKraft had nothing to do with Costco's decision not to carry NH's kitchen, and KidKraft never said anything to Costco about NH or any competitor's product. *Id.* at 84:25–85:7; 107:24–108:6, 146:16-25; 155:15–156:15.

Plaintiffs offer no evidence to raise a genuine dispute about these dispositive facts. Instead, they cite Ms. Triplett's inability to answer a question about theoretical possibilities. Pl. Supp. at 3. But that's not evidence. "███████████" is not a basis to send this case

---

Weiss that Costco rejected NH's offer because it feared jeopardizing its relationship with KidKraft. SOF ¶¶ 36, 60–70. After Ms. Lord submitted a declaration explaining that such a phone call never happened, Plaintiffs opposed summary judgment on the basis that they had not yet deposed Ms. Lord. MSJ Opp. at 7–8, Opp. SOF ¶¶ 62–64, 68–69. But Plaintiffs did not even try to depose her, thereby conceding there is no evidence to support their claim. Ms. Lord's declaration and SOF ¶¶ 62-64, 68-69 are undisputed.

[2] NH's sales representative, Michael Drobnis, testified that no one at Costco ever told him that Costco feared retaliation from KidKraft, and that he has no knowledge of KidKraft threatening Costco not to carry competitors' products. *See* Supp. Ex. 6 (Drobnis 100:15–101:5; 131:23–132:8). He testified that he has "███████████" whether KidKraft said anything to Costco, and that it wouldn't "███████" to threaten a retailer "███████████████████████." *Id.* at 122:19–22, 22:12–23:3.

2

to a jury. Ms. Triplett—Costco's toy buyer—testified clearly that (i) she is not aware of KidKraft ever threatening Costco about NH, and (ii) if that actually happened, she would know about it. Supp. Ex. 1 (Triplett 155:15–156:15). There is no evidence to the contrary. Lacking evidence, Plaintiffs try to divert attention by pointing to documents that have nothing to do with Plaintiffs or the sale of toy kitchens in the U.S. First, Plaintiffs cite an email about Costco **Canada**'s eCommerce business, even though they do not claim they attempted to sell kitchens to Costco Canada. Pl. Supp. at 3 & Ex. 16. The email is clear on its face that it relates to Costco **Canada**, and Ms. Triplett confirmed that it had nothing to do with her buying decisions in the U.S. Supp. Ex. 1 (Triplett 72:19–73:9; 91:18–23; 94:24–95:3; 158:4–11). Second, Plaintiffs cite a document that relates to *train sets*—not kitchens—that has no connection with Costco's decision not to carry NH's toy kitchen.[3] Not surprisingly, there is nothing in these documents that mentions Plaintiffs or provides any evidence that KidKraft ever said anything to Costco about Plaintiffs. Plaintiffs' paranoid speculation is not evidence.[4]

## II. KidKraft's Termination of OJC Is Not an Antitrust Violation as a Matter of Law.

As before, Plaintiffs are left with nothing but their claim that KidKraft terminated OJC as a KidKraft retailer, which is not an antitrust violation. MSJ Reply at 6–8. It is undisputed that OJC never stopped selling NH toy kitchens, and those sales *skyrocketed* post-termination. Reply SOF ¶¶ 95–96. KidKraft's refusal to sell *KidKraft* kitchens to OJC could not possibly foreclose OJC's sale of its own *NH* kitchens. Moreover, Plaintiffs do not attempt to point to any evidence showing that reducing one retailer of KidKraft toy kitchens among hundreds nationwide, which sold just ■ KidKraft toy kitchens over a 6-month span in 2016 (Reply SOF ¶ 20), harmed competition in the alleged market. KidKraft is entitled to make its own decisions about the retailers with whom it will deal, and because there is no evidence of harm to competition from KidKraft terminating OJC as a retailer of KidKraft products, summary judgment in KidKraft's favor is required. *See* MSJ at 11, MSJ Reply at 6–7.[5]

---

[3] Pl. Supp. Ex. 15 relates to an agreement to make a particular **train set** available exclusively to Costco—a practice wholly acceptable and not violative of antitrust laws. This email has nothing to do with Plaintiffs or even toy kitchens, and it does not refer to "cut[ting]off all retailers" as Plaintiffs absurdly claim.

[4] Plaintiffs also contend that KidKraft was "[g]earing up for war" based on the idea that documents that do not reference Plaintiffs in any way somehow suggest KidKraft was trying to exclude competition. Pl. Supp. at 1–3. Plaintiffs even quote an email from KidKraft's former president to a college buddy where he recommends how to try to sell more bicycles on Amazon—something that has no connection to Plaintiffs. *See* Pl. Supp. Ex. 2. And, to top it off, Plaintiffs rely on an International sales team document that has nothing to do with toy kitchens, Plaintiffs, or U.S. sales. *See* Pl. Supp. Ex. 21.

[5] Plaintiffs also reference their allegation that they voluntarily pulled back on developing other products in July

Instead of pointing to any genuine dispute as to dispositive facts, Plaintiffs argue there should be a trial over KidKraft's "motive" for terminating OJC. Pl. Supp. at 4–5. But that is wrong as a matter of law. MSJ at 16–17, MSJ Reply at 8. Even if, as Plaintiffs assert, KidKraft terminated OJC because it did not want to do business with a retailer that chose to compete with it, summary judgment is required. MSJ at 13–14, MSJ Reply at 8. No law requires KidKraft to continue to do business with a disloyal retailer that has become a competitor, particularly where there is no evidence that the refusal to deal has excluded competition. *Id.*[6] Thus, regardless of KidKraft's motive, its termination of OJC—which did not foreclose OJC from selling NH kitchens, as shown by the undisputed fact that OJC's sales of NH kitchens soared after the termination—cannot be the basis for an antitrust claim.

### III. As a Matter of Law, KidKraft Lacks Monopoly Power.

Post-briefing discovery has not raised any dispute about the facts that conclusively demonstrate that KidKraft is not a monopolist. It remains undisputed that KidKraft lost placement to competitors on the very accounts at which Plaintiffs claim they were foreclosed. *See* MSJ at 18, MSJ Reply at 9. Costco's toy buyer testified that she considered two other toy kitchens (Teamson and Step2) in addition to KidKraft's in 2017, and chose Teamson's. Supp. Ex. 1 (Triplett 114:16–116:13, 133:24–134:3). KidKraft also lost placement to competitors at other retailers, including Sam's Club, Walmart, Toys "R" Us, and Target. Supp. Ex. 7 (Light 7/24 313:9–22). Instead of disputing this dispositive evidence, Plaintiffs argue that KidKraft is a monopolist by pulling quotes out of context from documents[7] and extrapolating absurd

---

2015 in an effort to please KidKraft. Pl. Supp. at 2–3. But there is no evidence KidKraft ever asked for or agreed to this, nor any evidence that Plaintiffs' purported unilateral decision impacted competition in any way. Thus, even if Plaintiffs' allegation is taken as true there is no evidence KidKraft did anything to foreclose NH from the market. MSJ Reply at 4–5. Plaintiffs' Supplement changes nothing in this regard.

[6] As one court reiterated earlier this month, "Competitors are not required to engage in a lovefest." *FTC v. Qualcomm*, 2020 WL 4591476, at *11 (9th Cir. Aug. 11, 2020). That is because "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer . . . freely to exercise his own independent discretion as to parties with whom he will deal.'" *Id.* (quoting *Trinko*, 540 U.S. at 408). *Qualcomm* emphasized that *Aspen Skiing* (on which Plaintiffs rely) provides only a "limited exception to this general rule," which "should be applied only in rare circumstances." *Id.* at *11–12. Among other factors required to invoke the rare *Aspen Skiing* exception, a plaintiff must show that "the *only* conceivable rationale or purpose" of a refusal to deal "is 'to sacrifice short-term benefits in order to obtain higher profits in the long run *from the exclusion of competition.*'" *Id.* at *11 (emphases added). Where, as here, there is no evidence that the refusal to deal excluded competition, the "limited exception" of *Aspen Skiing* cannot possibly apply. *Id.* at *11–13.

[7] For example, Plaintiffs quote an email in which a junior salesperson suggested seeking a higher sales price to Walmart, and argue that it suggests KidKraft "can control prices." Pl. Supp at 1. Nonsense. An internal email from a junior salesperson suggesting a price increase is not evidence of a *monopoly*. Moreover, Plaintiffs' cite to this document is misleading at best. KidKraft's Head of Sales testified that (i) this idea made

4

inferences from irrelevant circumstances.[8]  These tangents are not indicators of monopoly power even if taken as true.

## IV. KidKraft and MidOcean Are Not Capable of Conspiring.

It is undisputed that, at all relevant times, MidOcean has been the majority owner of KidKraft, controls KidKraft's Board, and controls KidKraft's strategic direction.  *See* Reply SOF ¶¶ 2–6.  Under an unbroken chain of precedent following *Copperweld*, that is the end of Plaintiffs' claim that MidOcean somehow conspired with KidKraft.  MSJ at 19.  Plaintiffs argue for the first time that *Copperweld* should not apply because MidOcean might theoretically acquire a company that competes with KidKraft.  Pl. Supp. at 5.  But the same can be said of *any* parent company in any industry, and Plaintiffs cite no case that has ever adopted such a standard.  Plaintiffs' approach would turn *Copperweld* on its head.  Parent companies who acquired competing sister companies would become walking conspiracies under Section 1.  But every circuit court to address this question has held that sister companies are not liable under Section 1 for agreements with their shared parent or with each other.[9]  Companies acquire competing companies all the time—the core point of *Copperweld* is that, once acquired, formerly competing companies are within one corporate family and are *incapable* of conspiring under Section 1.  There is no evidence that could take MidOcean and its majority-owned portfolio company outside the protection of *Copperweld*.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment and award it judgment on all of Plaintiffs' claims as a matter of law.

---

"▓▓▓▓▓" to him at the time, (ii) KidKraft did not try to raise prices to Walmart, (iii) he thought the suggestion was "▓▓▓▓," (iv) the junior salesperson was "▓▓▓▓▓" in her assertions about competition in the marketplace, (v) this e-mail "▓▓▓▓▓▓" with OJC or NH, and (vi) KidKraft lost the Walmart business thereafter to a plastic kitchen.  Supp. Ex. 2 (Light 7/30 39:3–41:7).

[8] Plaintiffs describe how KidKraft suspended customers' product inventory feeds where customers sold products below a suggested retail price.  These episodes have no connection to Plaintiffs or the alleged events of this case.  Moreover, minimum pricing policies—a common practice across suppliers of all sizes—are not evidence of monopoly power.  *See* Reply SOF ¶ 106; Vellturo Reb. Rep. ¶¶ 82–88.  The Supreme Court has held that resale price maintenance practices do not violate antitrust laws and are not indicative of market power or competitive harm.  *See Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 887, 898 (2007).

[9] *See, e.g., Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1233 (10th Cir. 2017) ("every circuit to address the question" has held that "sister corporations that are wholly owned subsidiaries of the same parent" cannot violate Section 1); *Gonzalez-Maldonado v. MMM Healthcare*, 693 F.3d 244, 249 (1st Cir. 2012) (no Section 1 liability where two HMOs were sister companies controlled by a common parent).

|  |  |
|---|---|
| DATED:  August 31, 2020 | Respectfully submitted, |

/s/ *Joshua Lipton*
Joshua Lipton (*Pro Hac Vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:     202.955.8500
Facsimile:      202.467.0539
jlipton@gibsondunn.com

Scott K. Hvidt (*Pro Hac Vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue
Dallas, Texas  75201-6911
Telephone:  (214) 698-3317
Facsimile:  (214) 571-2981
shvidt@gibsondunn.com

-and-

Lawrence D. Silverman, Esq.
Florida Bar Number:  7160
Email:  lawrence.silverman@akerman.com
Alexandra M. Mora, Esq.
Florida Bar Number:  052368
Email:  alexandra.mora@akerman.com
AKERMAN LLP
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, FL  33131
Phone:  (305) 374-5600
Fax:  (305) 374-5095

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of August, 2020, a true and correct copy of the foregoing brief was served via the Court's CM/ECF System upon all counsel of record.

*/s/ Alexandra M. Mora*
Alexandra M. Mora